John DOE et al., Plaintiffs,

v.

Cathy E. IRWIN, Administrator, et al., Defendants.

No. G75–142 C.A.

United States District Court, W. D. Michigan, S. D.

March 7, 1977.

Hubbell, Blakeslee, McCormick & Houli-han, Stuart D. Hubbell and James R. McCormick, Traverse City, Mich., of counsel, for plaintiffs.

Michael G. Harrison, Lansing, Mich., for defendants.

## OPINION

FOX, Chief Judge.

This matter is apparently one of first impression and presents a classic confrontation between the rights of parents,[1] the rights of their minor, unemancipated children, the rights of the family, and the interests of the State. To this date the Supreme Court has not examined in depth the relationship between the rights of parents and the rights of their minor children. Nor has the Court made a careful analysis of the right to privacy of unemancipated minors. This action requires such an examination and analysis.

The instant action was filed April 7, 1975. The complaint seeks declaratory and injunctive relief that the policy of defendants, pursued under color of State law and regulation, of distributing contraceptive devices and medications to the minor, unemanci-

pated children of plaintiffs, without the knowledge and consent of, and contrary to the wishes of, the plaintiffs, deprived the plaintiffs of rights and privileges guaranteed to them by the First, Fifth, Ninth, and Fourteenth Amendments of the Constitution of the United States.

The issue, simply drawn, is whether or not this practice of prescribing birth control medication and/or devices to minors without notice or consultation with parents infringes constitutional rights. On the one hand is an assertion of the liberty of parents to educate and raise their children and on the other is the State's asserted interest in preventing (so-called) unwanted children.

Plaintiffs Doe are the parents of a minor, unemancipated daughter who received contraceptives, both prescriptive and nonprescriptive, from the Ingham County Family Planning Center, a/k/a Tri-County Family Planning Center (hereinafter Center). Minor Child Doe obtained these contraceptives without the knowledge or consent of her parents. Plaintiffs Grost are the parents of two minor, unemancipated children, live in the area served by the Center, and are opposed to the distribution of contraceptives to their children without their knowledge or consent.

Defendants are the respective administrators of the Center in question and the respective members and director of the Ingham County Board of Health. Defendants in answer deny that they are violating any constitutional rights of the plaintiffs. Defendants also offer the affirmative defenses that the plaintiffs have no constitutional right to prohibit their minor children from receiving contraceptives; that minors who are capable of giving informed consent have a fundamental constitutional right to receive contraceptives without parental consent or knowledge; and that defendants have a fundamental constitutional right to distribute contraceptives to minors who are capable of giving informed consent without parental knowledge or consent. Defend-

---

1. Whenever the word "parent" is used in this opinion, it should, of course, be read so as to include both parents and legal guardians.

ants agreed that plaintiffs were proper representatives of a class of similarly-situated parents. Plaintiff's motion to certify this as a proper class action under Rule 23(c)(1) of the Federal Rules of Civil Procedure was granted.

A petition to intervene as defendants was jointly filed by a number of parties. Among these parties were doctors who allegedly would be affected by a decision in this matter; the Michigan Planned Parenthood Council; and two unemancipated minors who desired to be provided with contraceptives without notice or consent of their parents. Because I found that the interests of these petitioners were adequately represented by the original defendants, the petition to intervene was denied. Petitioners were invited to file briefs as amicus curiae. No such briefs have been filed. No appeal was taken from the order denying intervention.

The record in this matter contains numerous depositions, interrogatories, affidavits, stipulations, and documentary evidence. The briefs of the parties are scholarly and extensive. The parties have now stipulated that the record is sufficient to reach a decision on the merits and that no trial need be had.

The parties have stipulated to the following facts:

(1) That the Ingham County Health Department operates through a contract with the Michigan Department of Public Health, a family planning center (hereinafter referred to as the "center"), which serves Ingham County as well as Clinton and Eaton Counties.

(2) That the Plaintiffs Doe, are husband and wife, and citizens of the United States and of the State of Michigan, and residents of Ingham County.

(3) That the Plaintiffs Doe, are parents of a minor daughter, born September 9, 1957, who resides with them, is not emancipated, and attends high school. That said daughter is of average intelligence and maturity with respect to other persons of her age.

(4) That the Plaintiffs Grost, are husband and wife, and citizens of the United States and of the State of Michigan, and residents of Ingham County. That they are parents of a minor son and a minor daughter, both of whom reside with them, are not emancipated and attend school. That said children are of average intelligence and maturity with respect to other persons of their age.

(5) That Defendant Marianne Davis is the Administrator of the center and that Defendant John Hazen, M.D., was its medical director until August 1, 1975. [Davis and Hazen were, respectively, succeeded in office by Cathy E. Irwin and George Gross, D.O. Irwin and Gross have been substituted as named defendants.] Said Defendant Marianne Davis is responsible for the supervision and administration of the center in which the medical director participates.

(6) That Defendants Elinor Holbrook, Gilda Richardson, Marie Vande Bunte and Ronald Peters are members of the Ingham County Board of Health, which Board has affirmed the policy hereinafter discussed and which is the subject matter of this litigation.

(7) That Defendant George Dellaportas, M.D., is the Director of the Ingham County Health Department and is the chief administrator of the policies of that Department, including the Center. [Dellaportas has been succeeded in office by Mary Woods, R.N., who has been substituted as a named defendant.]

(8) That all named defendants, when serving in their official capacities, act under the color and authority of the laws of the State of Michigan.

(9) That the center serves minors who may or may not be emancipated.

(10) That prior to any minor being served at the center, they are required to attend a "rap session" which is designed to be educational in nature, where such matters as birth control methods, responsibilities of being sexually active and communication with parents and partners are discussed.

(11) That neither the center nor any of its services relating to minors are adver-

tised nor are minors sought out or encouraged to attend the center by any named defendant or any other county official.

(12) That all female minors who attend the center are given a medical history and a physical examination, both of which are consistent with good medical practice for the prescription of contraceptive devices or medication to females and in conformity with the requirements of the Michigan Department of Public Health and the United States Department of Health, Education and Welfare.

(13) That if any medical problems are indicated, such persons are referred to a family or other physician.

(14) That only if no medical problem is indicated is a contraceptive device or medication prescribed.

(15) That contraceptive devices or medication are prescribed to minors.

(16) That minors visiting the center may or may not be there with parental knowledge and/or consent and that the prescription of contraceptive devices or medication to minors may or may not be with parental knowledge and/or consent.

(17) That there is no charge for the services rendered at the center or for the contraceptive devices or medication distributed.

(18) That of those persons visiting the center during the 1974 fiscal year and under the age of 18, 623 were 17, 466 were 16, 210 were 15, 74 were 14, and 19 were 13.

(19) That such studies of the center as have been made indicate:

(a) Eighty-eight percent of the minors surveyed lived with their parents.

(b) Seventy-six percent were students.

(c) Eighty-nine percent had had intercourse at least once prior to visiting the center.

(d) Ten percent had been pregnant at least once.

(20) That the minor daughter of Plaintiffs Doe visited the center, was given the normal medical history and physical examination and was furnished with certain contraceptive devices and medication, without parental knowledge or consent.

(21) That there are parents who are opposed to the prescribing and distributing of contraceptive devices and medication to their children.

(22) That there are parents who favor the prescribing and distribution of contraceptive devices and medication to their minor children.

In addition, the parties have submitted Joint Exhibit I: New Patient Enrollment Record; and Joint Exhibit II: Clinic Folder.

Also included as a part of the record of this action are the uncontroverted affidavits of officials of the Church of Jesus Christ of Latter-Day Saints and the American Baptist Churches of Michigan who state that a number of members of their respective religions live in Ingham County; that these members adhere to the beliefs and tenets of said religious faith; and further:

"That it is a central and fundamental teaching and tenet of said religious faith that parents are the primary educators of their own children superior in right and responsibility to the State; that, specifically, in the area of sexual education it is the primary right and responsibility of parents to educate their own children as to matters of faith and morals concerning the exercise of the human sexual function and that the state must respect and abide by that parental right and priority. *Finally, it is a fundamental and deeply held belief of members of said religious beliefs and, specifically, of parents of minor children who practice such faith that sexual intercourse between those not married is sinful, a violation of God's law and forbidden to any adherent to said religious faith.* That accordingly, any agency of the state which would teach a minor child of a parent belonging to said religious faith a philosophy of sexual behavior accepting extra-marital sexual intercourse as permissible and which would provide minor children of said parents, without their knowledge or consent, birth control information and devices would seriously

invade and infringe upon the religious beliefs and freedoms of said parents."[2] (Emphasis supplied.)

## I. FINDINGS OF FACT.

The parties engaged in extensive discovery, by deposition and interrogatory, of numerous medical and psychological experts. Based upon these documents and in accordance with the stipulation of the parties, I make the following Findings of Fact.

(1) There are substantial medical and psychological risks in the use of the contraceptive pill by minor women. Among the side effects of the pill are increased risks of thromboembolic phenomena (inflammation of the veins and clotting) and the possibility of permanent anovulation (permanent sterility after discontinuance of the pill), which may occur with greater frequency among young women who have not yet established a regular menstrual cycle before initiating use of the pill. (Eliot deposition, pp. 17–19.) Other possible side effects of the pill are high blood pressure, mental depression, and changes in libido. (Eliot, pp. 50–54.) Where a minor girl is taking the pill without her parent's knowledge or consent, there may be particular complications where the girl, suffering from side effects of the pill, dare not tell her parents or family physician, thereby leading to further complications in treatment. (Ford deposition, pp. 62–63.)

There is general agreement that the most widely used birth control device, "the pill," is fraught with risks, see Joint Exhibit II; Ford deposition, pages 20–26, 40–44, 56; and Exhibit 1 to Ford deposition; Eliot deposition, page 56; which are deemed medically acceptable when compared with the benefits of the drug. While the risks relate to hormonal changes in the female reproductive system caused by the pill, no studies have been cited to the court on the long-term effects of the pill when its ingestion is commenced during adolescence, a period of life in which hormonal changes of a significant kind are occurring naturally in the body.

(2) There are substantial medical and psychological risks to pregnancy among teenage females. Pregnant teens have greater risks of toxemia and anemia, and greater risks of giving birth to premature or retarded children. (Eliot, pp. 23–25.) Pregnant teens suffer a higher risk of dying at childbirth—in general, a pregnancy for a minor girl is about twice as dangerous as for more mature women. (Corsa deposition, p. 28.) Teenage mothers are more likely to beat their children than older mothers. (Poffenberger deposition, p. 30).

(3) There are often serious emotional problems which may cause minors to engage in sexual intercourse in an effort to seek a solution to their problems and sexual intercourse may lead to emotional problems

**2.** From eternity the Son of God had lived the family life of the Blessed Trinity. At Nazareth, as the Redeemer both of individuals and of families, He lived and made holy the home life that guards divine life in every baptized person.

Problems of family life center mainly in personalities. But social pressures and poverty also add disturbing tensions. Happily, God made marriage a sacrament, which is ministered by husband and wife to one another. Through the sacrament, they communicate to one another those special graces they need for living their enduring and sometimes difficult obligations.

God remains the third partner in every marriage, with His own inalienable rights. In the Holy Family, God Incarnate was the third member. In a Christian family, anywhere in the world, the father is the spiritual head who takes the place of Christ.

*Col. 3:12–17*

A Christian family is a little mystical body. Its members are meant to be holy with the indwelling divine life. Therefore the members must respect, love, and help one another to live together happily.

*Luke 2:42–52*

GOSPEL

The wisdom of mankind's Redeemer was manifested in the Temple when He was only twelve. But He returned to normal family life at Nazareth, grew in natural knowledge, and showed outwardly His inner fullness of grace.

Maryknoll Missal, Vatican II Edition.

The christian family relies on its belief that the divine, special grace strengthen the sanctity, integrity and stability of christian families, which is first and foremost in their lives.

when engaged in by immature minors. As was stated by one of defendants' experts:

"[Y]oung people who come for contraceptives may come for other reasons, also. That is, they really want help. They want emotional help. They want help with other problems, and that their sex relations that they are having are simply symptomatic of rather deepseated, sometimes, emotional problems." (Poffenberger, p. 17.)

(4) The procedures of the Center, in greater detail than that provided by the parties in their Stipulation of Facts is as follows:

Before being served by the Center, all minors must first attend a "rap session" held at the County Board of Health Building. This session is given once a week and lasts for about two and one-half hours. A movie is shown and a general discussion follows on various topics such as birth control and communication with parents, friends and partners. The general discussion is led by a social worker, who also answers questions. The "rap session" then breaks down into smaller discussion groups led by medical or social work students. Approximately eight to thirty-five persons attend these weekly sessions, almost all of them minors and almost all of them female. (Davis deposition, pp. 11–12.)

At the end of the "rap session," those present are advised of the services offered by the Center and told to make an appointment if they desire to take advantage of these services. (Davis deposition, p. 20.) The medical risks which may result from use of the pill are described by the social worker at the time of the "rap session." (Davis deposition, pp. 27–28.) When the girl arrives at the Center, her medical history is taken and she is then given blood pressure and hematocrit tests and a urinalysis is made. The female teenager then talks with a nurse or para-professional screening person. (Davis deposition p. 43.) If the medical history is in order, contraceptive pills are prescribed if requested. At no time does the clinic make a specific determination as to the maturity of the minor (Davis deposition, p. 50), although if it is suspected that the patient is falsifying her medical history she is sent to the social worker or the Center's doctor for further discussion. (Davis deposition, p. 46.) The doctor present does not see every patient, nor does he measure the maturity of those patients he does see. (Holtzman deposition, pp. 7, 12 and 14.)

(5) Both parties' experts agree that there is no definitive way to measure the maturity of the minors who use the Center's services. (Poffenberger deposition, p. 42; Holtzman deposition, pp. 15–16; Hodgson deposition, p. 1; Vander Goot deposition, p. 5.) The parties, however, disagree as to the implications of such a situation.

Defendants contend that maturity to make an informed decision as to risks in using the contraceptive pill is shown by the simple fact that the girl is mature enough to seek out the services of the clinic. (Poffenberger deposition, p. 34; Holtzman deposition, p. 29; Hodgson deposition, p. 2.) Plaintiffs on the other hand, argue that the average minor is not mature enough to understand the risks of contraceptives and the implications thereof. (Rue deposition, pp. 27–28; Vander Goot deposition, p. 4.).

Emotional maturity is a "relative thing." (Poffenberger deposition, p. 52.) According to one of defendants' experts: .

"Just as the menarche (endocrine maturity) may range from 9 to 17 yrs., so does the psychological maturation vary with each individual. Each patient must be evaluated individually in regard to her degree of maturity and ability to make decisions without parental support." (Hodgson deposition, p. 1.)

Another of defendants' experts conceded that the leader of the "rap session" [3] may not find out anything about the emotional makeup of certain participants and that

---

3. A "rap session" is intended to be an educational process and a part of the upbringing of a child, and is within the vital concern of the parents in the education of their children. See *Wisconsin v. Yoder*, 406 U.S. 205, 92 S.Ct. 1526, 32 L.Ed.2d 15 (1972).

"given the limited facilities, you do what you can." (Poffenberger deposition, p. 42.)

What is clear is that whether or not the minor is emotionally mature and able to make an informed decision as to the risks of the use of contraceptives and the initiation of sexual relations cannot be judged with any reliability by the staff of the Center in the limited amount of time it deals with each patient. (Vander Goot deposition, p. 5; Rue deposition, p. 40.) This is especially so where the Center appears to be predisposed to prescribe contraceptives in the absence of medical or psychological problems appearing clearly upon the face of the patient's record.

(6) If the exclusion of the parents from the contraceptive decision involves, in the mind of the child, a deception of the parents, and another adult (e. g., medical practitioner, counselor, etc.) assumes the role of surrogate parent, the process may have a detrimental effect upon the parent-child relationship. The young person may interpret parental opposition as an indication her parents have poor judgment, are arbitrarily denying their daughter normal and desirable experiences and are motivated by ill will. (Vander Goot deposition, p. 7.).

(7) Although defendants contend that a requirement of either parental consent or notice would greatly decrease the number of teens who take advantage of the Clinic's services and would result in an increase in teenage pregnancies (Poffenberger deposition, p. 27; Corsa deposition, p. 27), they offered no evidence to support that assumption. I find a requirement of notice to the parents and the opportunity for them to consult in their child's contraceptive decision would impose only a minor burden upon the State's asserted interest.

(8) There is no assertion in this case that the dispensation of birth control medication and devices causes a decrease in either sexual activity or venereal disease, and the evidence presented is inconclusive as to whether or not wide-spread circulation of such devices and medication increases such activity or disease. From a purely statistical standpoint, however, the rise in venereal disease (described as an "epidemic," Rue deposition, pages 42–43; Holtzman deposition, page 22; Ford deposition, pages 59–60) and unwanted pregnancies has been dramatic despite increasing dispensation of birth control devices and medication. (Ford deposition, page 59.) Plaintiffs' interpretation of this last fact is that the availability of the birth control devices furthers promiscuity, venereal disease, and unwanted pregnancy. Defendants' interpretation is that it is an indication of the great need for expanded efforts at sex education and birth control device distribution.

(9) There is agreement that there is a four to five-year gap between physical and emotional maturity during adolescence (Corsa deposition, page 72–73), and that minors generally do not use the pill as intelligently and effectively as other young people. (Rue deposition, page 27–29; Poffenberger deposition, page 61; Corsa deposition, page 74.) Defendant Davis, administrator of the defendant clinic, admitted that there was no attempt on the part of clinic personnel to determine maturity of the part of prospective users of the pill because the clinic was concerned about an applicant's health, not her maturity. (Davis deposition, pages 49–50.)

## II. CONCLUSIONS OF LAW.

The defendants make the following arguments in their defense: (1) that parental rights do not permit a veto of a minor's decision to receive contraceptives; (2) that minors have a constitutionally protected right to receive contraceptives and family planning services; (3) that the state has a compelling interest in dispensing contraceptives upon request of a minor and approval of medical personnel; and (4) that the Social Security Act prohibits imposition of a parental knowledge and consent requirement. These contentions will be examined seriatim.

### (1) *Parental Rights.*

The family is the primary and essential cell of our society. By nature it is anterior, both in idea and in fact, to the State. The

family therefore must have independent rights and responsibilities prior to those of the State; it must not be absorbed by the State. This freedom of the family should be permitted as far as possible without jeopardizing the common good. The result of this freedom of independent rights and responsibilities is moral, mental and physical strength in the individual and in the family unit. This strength is essential to the existence of this nation as it is in the family that the State finds the roots of its greatness and power.

The existence of the family is dependent upon parental rights and responsibilities to build, maintain, and guide the family morally, mentally, and physically. Only in the situation of a family finding itself in great difficulty resulting from internal or external problems should the State intervene. The State intervention should then be no more extensive than is necessary to alleviate the problem causing the difficulty. As one commentator has stated:

". . ., [T]he common welfare in the temporal order, consists in that peace and security in which families and individual citizens have the free exercise of their rights, and at the same time enjoy the greatest spiritual and temporal prosperity possible in this life by the mutual union and coordination of the work of all. The function, therefore, of the civil authority residing in the State is twofold, to protect and to foster, but by no means to absorb the family and the individual, or *to substitute itself for them.* . . ."
Principles for Peace, ed. Koenig, 1943, p. 388, at 390. (Emphasis added.)

That the values fostered by the family unit are valuable to our way of life was recognized by the Founding Fathers. Both the Northwest Ordinance of 1787, Art. III, and the Michigan State Constitution, Art. VIII, § 1, contain the following provision:

"Religion, morality, and knowledge being necessary to good government and the happiness of mankind, schools and the means of education shall forever be encouraged."

The integrity of the family unit has been jealously protected by the courts of this nation against unreasonable interference by the State. The right of parents to the custody, education, and control of their children has a prominent, dominative place in our society.

▆▆▆ In *Wisconsin v. Yoder*, 406 U.S. 205, 92 S.Ct. 1526, 32 L.Ed.2d 15 (1972), the Supreme Court upheld the rights of Amish parents to disregard certain state mandatory school attendance statutes. The Court in *Yoder* stated that:

"[T]his case involves the fundamental interest of parents, as contrasted with that of the State, *to guide the religious future and education of their children.* The history and culture of Western civilization reflect a strong tradition of parental concern for the *nurture and upbringing of their children. This primary role of the parents in the upbringing of their children is now established beyond debate* as an enduring American tradition." Id., 406 U.S. at 232, 92 S.Ct. at 1541. (Emphasis added.)

The *Yoder* case relied heavily upon the earlier decision of the Supreme Court in *Pierce v. Society of Sisters*, 268 U.S. 510, 45 S.Ct. 571, 69 L.Ed. 1070 (1925), which upheld the right of parents to send their children to sectarian as opposed to public schools. *Society of Sisters* contains the following statement:

"The fundamental theory of liberty upon which all governments in this Union repose excludes any general power of the State to standardize its children by forcing them to accept instruction from public teachers only. The child is not the mere creature of the state; *those who nurture him and direct his destiny have the right, coupled with the high duty, to recognize and prepare him for additional obligations.*" Id. 268 U.S. at 534–35, 45 S.Ct. at 573. (Emphasis added.)

Parents, therefore, have a right of privacy in the care and control of their minor children and a right to the free exercise of their religion in the spiritual education of their children. These rights are protected

under the First, Fifth, Ninth, and Fourteenth Amendments to the Constitution from the officious intermeddling of (even) well-intentioned public officials. Particularly where the Free Exercise clause of the First Amendment is implicated, the State must show a compelling interest to interfere with the religious and moral activities of the family unit and its individual members. *Yoder*, supra, 406 U.S. at 233, 92 S.Ct. 1526. Therefore, absent a showing of compelling state interest, or a showing of superior rights in the minor child, the State may not totally exclude parents from the decision of their minor, unemancipated children as to whether *or not* to initiate sexual activity and consent to the risks of contraceptive devices and medications. A refusal to recognize the rights and the responsibilities of parents in such fundamental decisions of their children would present a frightening alternative.

Nor do I read the recent decisions of the Supreme Court and other federal courts with regard to parental consent in the decisions of their children to have an abortion as allowing the State to totally exclude the parents of the child from such an important matter. In *Planned Parenthood of Central Missouri v. Danforth*, 428 U.S. 52, 96 S.Ct. 2831, 49 L.Ed.2d 788 (1976), the Court, after only a summary analysis of parental discretion and the right to privacy of minors, stated:

> "We agree . . . that the State may not impose a *blanket* provision, such as § 3(4), requiring the consent of a parent or person in loco parentis as a condition for abortion during the first 12 weeks of her pregnancy. Just as with the requirement of consent from the spouse, so here, the State does not have the constitutional authority to give a third party an *absolute*, and *possibly arbitrary*, veto over the decision of the physician and his patient to terminate the patient's pregnancy, *regardless of the reason for withholding consent.*" Id., 428 U.S. at 74, 96 S.Ct. at 2843, 49 L.Ed.2d at 807–8. (Emphasis added.)

What the Court found objectionable in *Danforth* was that the Missouri statute gave parents an absolute veto over the decision of their minor child to have an abortion. Under the statute overturned there, a parent could withhold his or her consent for no reason or for any reason.

A close reading of the concurring and dissenting opinions in *Danforth* indicates a majority of the court would find acceptable a statute requiring parental consent or consultation in most instances, but providing for prompt (1) judicial resolution of any disagreement between the parent and the child, or (2) judicial determination that the minor is mature enough to give informed consent without parental concurrence, or that the abortion in any event is in the minor's best interest. Id., 428 U.S. at 91, 96 S.Ct. at 2851, 49 L.Ed.2d at 817 (Stewart, J., concurring). As was stated by Justice Stewart in a concurring opinion:

> There can be little doubt that the State furthers a constitutionally permissible end by encouraging an unmarried pregnant minor to seek the help and advice of her parents in making the very important decision whether or not to bear a child. That is a grave decision, and a *girl of tender years, under emotional stress, may be ill-equipped to make it without mature advice and emotional support. It seems unlikely that she will obtain adequate counsel and support from the attending physician at an abortion clinic*, where abortions for pregnant minors frequently take place. Id., 428 U.S. at 91, 96 S.Ct. at 2851, 49 L.Ed.2d at 817 (Powell, J., concurring). (Emphasis added.)

Further, the dissenting opinion of Justice White, with whom The Chief Justice and Justice Rehnquist joined, points out that:

> [T]he purpose of the parental consent requirement is not merely to vindicate any interest of the parent or of the State. The purpose of the requirement is to vindicate the very right created in *Roe v. Wade*, [410 U.S. 113, 93 S.Ct. 705, 35 L.Ed.2d 147] supra—the right of the pregnant woman to decide "whether *or not* to terminate her pregnancy." Id., at 153, 93 S.Ct. 705, 35 L.Ed.2d 147 (emphasis added). The abortion decision is un-

questionably important and has irrevocable consequences whichever way it is made. Missouri is entitled to protect the minor unmarried woman from making the decision in a way which is not in her own best interests, and it seeks to achieve this goal by requiring parental consultation and consent. This is the traditional way by which States have sought to protect children from their own immature and improvident decisions; and there is absolutely no reason expressed by the majority why the State may not utilize that method here. Id., 428 U.S. at 94, 96 S.Ct. at 2853, 49 L.Ed.2d at 819–820. Finally, Justice Stevens, dissenting, writes eloquently of the role of the parents in the abortion decision of their minor children:

If there is no parental consent requirement, many minors will submit to the abortion procedure without ever informing their parents. An assumption that the parental-reaction will be hostile, disparaging or violent no doubt persuades many children simply to bypass parental counsel which would in fact be loving, supportive and, indeed, for some indispensable. It is unrealistic, in my judgment, to assume that every parent-child relationship is either (a) so perfect that communication and accord will take place routinely or (b) so imperfect that the absence of communication reflects the child's correct prediction that the parent will exercise his or her veto arbitrarily to further a selfish interest rather than the child's interest. *A state legislature may conclude that most parents will be primarily interested in the welfare of their children, and further, that the imposition of a parental consent requirement is an appropriate method of giving the parents an opportunity to foster that welfare by helping a pregnant distressed child to make and to implement a correct decision.* Id., 428 U.S. at 103, 96 S.Ct. at 2857, 49 L.Ed.2d at 824. (Emphasis added.)

I recognize, of course, that *Danforth*, in which the State by statute sought to further the goal of parental involvement in the decision-making process of their minor chil-

dren, is a different case from the instant action, where parents seek to protect their rights in participating in their minor children's decision-making process against interference by the State. I quote at length from *Danforth*, however, to show that *Danforth* did not, as defendants claim, forever foreclose the parents of minor, unemancipated children from participating in the major decisions with which their children are faced. In fact, a majority of the Court expressed its support of the parental role in such situations.

The above interpretation of *Danforth* finds support in the companion case of *Bellotti v. Baird*, 428 U.S. 132, 96 S.Ct. 2857, 49 L.Ed.2d 844 (1976). *Bellotti* vacated and remanded the order of the lower court finding invalid a Massachusetts statute requiring parental consent, in most instances, to the abortion decision of their minor child. This statute provided in part:

"If one or both of the mother's parents refuse such consent, consent may be obtained by order of a judge of the superior court for good cause shown, after such hearing as he deems necessary." Id., 428 U.S. at 134, 96 S.Ct. at 2860, 49 L.Ed.2d at 848.

A three-judge court for the District of Massachusetts found this statute unconstitutional. A unanimous Court vacated and remanded to the District Court for certification of the question of proper construction of the statute to the Massachusetts Supreme Judicial Court. The Court stated that abstention is appropriate where an unconstrued state statute is susceptible of a construction by the state judiciary, "which might avoid in whole or in part the necessity for federal constitutional adjudication, or at least materially change the nature of the problem. (Citations omitted.)" Id., 147 U.S. at 428, 96 S.Ct. at 2866, 49 L.Ed.2d at 855.

The Court in *Bellotti* noted that:

The picture thus painted by the respective appellants is of a statute that prefers parental consultation and consent, but that permits a mature minor capable of giving informed consent to obtain, with-

out undue burden, an order permitting the abortion without parental consultation, and, further, permits even a minor incapable of giving informed consent to obtain an order without parental consultation where there is a showing that the abortion would be in her best interests. The statute, as thus read, would be fundamentally different from a statute that creates a "parental veto." Id., 428 U.S. at 145, 96 S.Ct. at 2865, 49 L.Ed.2d at 854.

*Bellotti* concluded that:

> In *Planned Parenthood of Missouri v. Danforth* [428 U.S. 52, 96 S.Ct. 2831, 49 L.Ed.2d 788], we today struck down a statute that created a parental veto. [428 U.S] at 72–75 [96 S.Ct. 2831, 49 L.Ed.2d 788]. At the same time, however, we held that a requirement of written consent on the part of a pregnant adult is not unconstitutional unless it unduly burdens the right to seek an abortion. In this case, we are concerned with a statute directed towards minors, as to whom there are unquestionably greater risks of inability to give an informed consent. Without holding that a requirement of a court hearing would not unduly burden the rights of a mature adult, cf. *Doe v. Rampton*, 366 F.Supp. 189 (Utah 1973), we think it clear that in the instant case adoption of appellants' interpretation would "at least materially change

the nature of the problem" that appellants claim is presented. *Harrison v. NAACP*, 360 U.S., [167] at 177, 79 S.Ct. [1025] at 1030, 3 L.Ed.2d 1152. Id., 428 U.S. at 147, 96 S.Ct. at 2866, 49 L.Ed.2d 856.[4]

It should also be noted that all other cases invalidating parental consent statutes for the abortions of minors involved absolute vetoes on the part of the parents such as the statute voided in *Danforth*.[5]

█ I do not conclude that the fact that the instant case involves parents attempting to enforce their rights as parents against State interference, rather than, as in the above cases, the State affirmatively attempting to further the rights of parents, has a substantive effect upon the above interpretation of the *Danforth* and *Bellotti* cases. The posture of the parties in the present case, of course, will be important in the process of balancing the rights of parents, the rights of their children, and the interests of the State. But, in the absence of overriding rights in their minor children and in the absence of compelling State interest, I conclude that parents have a constitutionally protected right to participate in the very important decisions of their minor, unemancipated children as to whether or not to initiate sexual activity or to undertake the substantial medical risks of certain contraceptives. The State, quite

---

**4.** The Massachusetts Supreme Judicial Court, upon the certification of the question remanded by the Supreme Court, held the statute in question did not give an absolute parental veto to the parents of minors who sought to obtain an abortion. The Court also held the statute requires consultation with the parents in all instances and notice to the parents of any judicial proceeding by the child to obtain an abortion in the absence of parental consent. The parent, in granting or refusing consent, is to consider exclusively the child's best interest. *Baird v. Attorney General*, 360 N.E. 288 (Mass. 1977).

**5.** See, *Poe v. Gerstein*, 517 F.2d 787 (5th Cir. 1975), Juris Statement pending, No. 75–713; *Jackson v. Guste*, (Civ.No. 74–2425) (E.D.La. Jan. 26, 1976), judgment vacated, —— U.S. ——, 97 S.Ct. 657, 50 L.Ed.2d 638 (1977); *Doe v. Zimmerman*, 405 F.Supp. 534 (M.D.Pa.1975); *Doe v. Exon*, 416 F.Supp. 716 (D.Neb.1975);

*Planned Parenthood Assn. v. Fitzpatrick*, 401 F.Supp. 554 (E.D.Pa.1975); *Foe v. Vanderhoof*, 389 F.Supp. 947 (D.Colo.1975); *Gary-Northwest Indiana Women's Services v. Bowen*, 421 F.Supp. 734 (N.D.Ind.1975); *Wolfe v. Schroering*, 388 F.Supp. 631 (W.D.Ky.1974), modified 541 F.2d 523; *State v. Koome*, 84 Wash.2d 901, 530 P.2d 260 (1975). Nearly all of the above cases recognized a less restrictive statute might be acceptable.

Cf., *T—— H——* 425 F.Supp. 873 (D.Utah, 1975) (invalidating absolute parental consent statute for distribution of contraceptives to minors); *Population Services International v. Wilson*, 398 F.Supp. 321 (S.D.N.Y. 1975), prob. jur. noted, 426 U.S. 918, 196 S.Ct. 2621, 49 L.Ed.2d 371 (1976) (three-judge court invalidated statute prohibiting access to nonprescription contraceptives to persons under age sixteen, even with the consent of the parent).

simply, in the absence of a compelling interest, may not, by statute, regulation, or action, totally exclude the parents of the child from such a momentous decision. Nor may it supplant the advice, love, understanding, and control of the parent with state-funded and state-controlled physicians, social workers, and counselors. Although the goal of the defendants, acting under color of state law, may be well intended, they are not warranted in insinuating their way into the delicate relationship between parent and child.

### (2) Rights of the Minor.

■ No analysis of the rights of parents vis-a-vis the interests of the State "can take place in a vacuum." *Wisconsin v. Yoder*, supra, 406 U.S. at 242, 92 S.Ct. at 1546 (Douglas, J., dissenting in part). The rights of the minor must also be considered. The commentary upon the right to privacy of minors and their right of access to abortions and contraceptives has been extensive.[6] The examination of this issue by the Supreme Court has not been as extensive. It is clear, however, that any right of privacy which the minor possesses in this matter must be weighed against those rights which reside in the minor's parents.

■ The Supreme Court has come to recognize that minors, as well as adults, are protected by the Constitution and possess constitutional rights. *Danforth*, supra, 428 U.S. at 74, 96 S.Ct. at 2843, 49 L.Ed.2d at 808.[7] The Court has also recognized, however, that certain fundamental civil rights accorded adults may be limited in their extension to minors, particularly when capacity to exercise that right is at issue.[8]

■ A holding of a civil right to privacy of a minor to access to contraceptives surely implicates the capacity of the minor. While the right to privacy in adults is a fundamental civil right, see *Griswold v. Connecticut*, 381 U.S. 479, 85 S.Ct. 1678, 14 L.Ed.2d 510 (1965), it would appear that its exercise by minors depends upon the capacity of the individual minor and is not unlimited, as defendants here contend. Nor does *Danforth* require a contrary conclusion. Even the plurality opinion there recognized that not every minor is capable of giving effective consent to a termination of her pregnancy. Supra, 428 U.S. at 74, 96 S.Ct. at 2843, 49 L.Ed.2d at 808. The majority of the Court recognized parental consultation in the decision could be required. Therefore, even if a minor may have a qualified civil right of access to contraceptives, the State, absent a compelling interest, may not expedite that right in such a manner as to unreasonably interfere with the fundamental rights of the parents to the custody, care, control, moral and religious education, and upbringing of a child.[9]

---

6. See, e. g., *Kleinfield*, The Balance of Power Among Infants, Their Parents, and the States, 4 Fam.L.Q. 410 (1970); Note, A Minor's Right to Contraceptives, 7 U.Cal. Davis L.Rev. 270 (1974); Note, Parental Consent Requirements and Privacy Rights of Minors: The Contraceptive Controversy, 88 Harv.L.Rev. 1001 (1975); Note, The Minor's Right to Abortion and the Requirement of Parental Consent, 60 Va.L.Rev. 305 (1974).

7. See, e. g., *Breed v. Jones*, 421 U.S. 519, 95 S.Ct. 1779, 44 L.Ed.2d 346 (1975) (right against being put in double jeopardy); *Goss v. Lopez*, 419 U.S. 565, 95 S.Ct. 729, 42 L.Ed.2d 725 (1975) (due process rights apply in school suspensions); *Tinker v. Des Moines School District*, 393 U.S. 503, 89 S.Ct. 733, 21 L.Ed.2d 731 (1969) (free speech); *In re Gault*, 387 U.S. 1, 87 S.Ct. 1428, 18 L.Ed.2d 527 (1967) (due process in juvenile court proceedings).

8. See, e. g., *Oregon v. Mitchell*, 400 U.S. 112, 91 S.Ct. 260, 27 L.Ed.2d 272 (1970) (denying the right to vote to eighteen years olds in state elections); *Rowan v. United States Post Office Dept.*, 397 U.S. 728, 90 S.Ct. 1484, 25 L.Ed.2d 736 (1970) (parents may reject mailed material being sent to minor members of family); *Prince v. Massachusetts*, 321 U.S. 158, 64 S.Ct. 438, 88 L.Ed. 645 (1944) (denying right to minor to distribute religious literature on public streets).

9. In addition to laws restricting a minor's capacity to marry, vote, or drink alcoholic beverages, are those restricting a minor's use of cigarettes, M.C.L.A. §§ 722.641–.642; and a minor's use of airguns, M.C.L.A. §§ 752.-891–.892. Minors are also subject to special provisions for arrest, M.C.L.A. § 750.139, and curfew, M.C.L.A. § 722.752. Finally, M.C.L.A. §§ 750.520b, 750.520c, and 750.520d make it a felony for a person of age to have intercourse, forcible or otherwise, with a person under the age of sixteen.

Even if a minor were to have a fundamental civil right of access to contraceptives without the consent of his or her parents, that would not require the total exclusion of the parents from having notice of the decision and a right to counsel and advise their child as to the moral, ethical, and medical risks involved in the use of contraceptives. Nor would it justify the substitution of the counsel of well-intentioned, state-funded and state-controlled physicians and social workers for the counsel of the child's parents. Where the fundamental rights of different persons collide, the courts, in resolving those rights, do not exalt one fundamental right to the total exclusion of the other, but rather make an attempt to balance the rights of the persons involved. For instance, an accused's right to a fair trial does not foreclose the freedom of the press to report the matter, in an attempt to prevent prejudicial pre-trial publicity and vice-versa. *Nebraska Press Assoc. v. Stuart,* 427 U.S. 539, 96 S.Ct. 2791, 49 L.Ed.2d 683 (1976). The State must do its utmost to accommodate both rights. As the Court stated in *Nebraska Press*:

"The authors of the Bill of Rights did not undertake to assign priorities as between First Amendment and Sixth Amendment rights, ranking one as superior to the other. In this case, the petitioners would have us declare the right of an accused subordinate to their right to publish in all circumstances. But if the authors of these guarantees, fully aware of the potential conflicts between them, were unwilling or unable to resolve the issue by assigning to one priority over the other, it is not for us to rewrite the Constitution by undertaking what they declined. It is unnecessary, after nearly two centuries, to establish a priority applicable in all circumstances." Id., 427 U.S. at 561, 96 S.Ct. at 2803, 49 L.Ed.2d at 699.

If there is any civil right in the minor to obtain contraceptives it does not serve to totally exclude the parents of those minors from this decision by means of a family planning center acting under color of State law.

If the State were to prevail, it would prematurely emancipate children, and especially girls from 12 through 17 years of age, from the authority, discipline, control, education, moral and religious upbringing, and advantages of the advice and counsel of parents. Such emancipation is contrary to the fundamental moral teachings of Western Civilization, especially the Founding Fathers, in the documents which spring from the Judeo-Christian religion, morality and philosophy. The State's exclusion of parents from the knowledge of their children's use of contraceptives is a jolting, deceptive, destructive impact upon the very integrity and stability of the family unit in this society.

(3) *Interests of the State.*

As stated above, defendants need show a compelling State interest to distribute contraceptive devices and medications to unemancipated minors in the absence of parental participation in the decision-making process. Defendants argue they need only show a reasonable interest to justify their actions and that, in the alternative, they can also meet a compelling State interest test.

Guidance as to which test applies can be found in *Prince v. Massachusetts,* 321 U.S. 158, 64 S.Ct. 438, 88 L.Ed. 645 (1944). *Prince* stated that:

"The parents' conflict with the state over control of the child and his training is serious enough when only secular matters are concerned. It becomes the more so when an element of religious conviction enters." Id., 321 U.S. at 165, 64 S.Ct. at 441.

Further analysis of this problem is provided by the Court in *Wisconsin v. Yoder,* supra, 406 U.S. at 233–234, 92 S.Ct. at 1542:

However read, the Court's holding in *Pierce* stands as a charter of the rights of parents to direct the religious upbringing of their children. And, when the interests of parenthood are combined with a free exercise claim of the nature revealed by this record, more than merely a *"reasonable relation to some purpose within*

*the competency of the State" is required to sustain the validity of the State's requirement under the First Amendment.* To be sure, the power of the parent, even when linked to a free exercise claim, may be subject to limitation under *Prince* if it appears that parental decisions will jeopardize the health or safety of the child, or have a potential for significant social burdens. But in this case, the Amish have introduced persuasive evidence undermining the arguments the State has advanced to support its claims in terms of the welfare of the child and society as a whole. The record strongly indicates that accommodating the religious objections of the Amish by forgoing one, or at most two, additional years of compulsory education will not impair the physical or mental health of the child, or result in an inability to be self-supporting or to discharge the duties and responsibilities of citizenship, or in any other way materially detract from the welfare of society. *Id.,* 406 U.S. at 233–34, 92 S.Ct. at 1542. (Emphasis added.)

Defendants argue, citing *Prince,* that the State has broad power to limit the freedom of parents in matters affecting the child's welfare. They also contend the actions here challenged fall within the police power of the State which " . . . must be held to embrace, at least, such reasonable regulations established *directly by legislative enactment* as will protect the public health and the public safety." *Jacobson v. Massachusetts,* 197 U.S. 11, 25, 25 S.Ct. 358, 361, 49 L.Ed. 643 (1905). (Emphasis added.) These arguments are not valid here for two reasons.

In the first instance, defendants point to no direct legislative enactment which permits them to totally exclude parents from their minor child's contraceptive decision. To the contrary, Michigan statutes exhibit a pervasive concern for the prerogatives and responsibilities of the parent with regard to their minor children. Michigan statutes prohibit instruction in birth control in the course of sex and health education classes in public schools, M.C.L.A. § 340.782 (1976), and permit parents to withdraw their children from classes on sex education, M.C.L.A. § 340.789c (1976).[10] Public health departments are not to immunize against certain diseases such as polio, smallpox, and diptheria, the children of parents who have religious objections to such treatments. M.C.L.A. § 329.501 (1976). Nor may state facilities require such immunization of children at group residence, care, education, and camping facilities if their parents object to such treatments due to their religious convictions. M.C.L.A. § 329.521 (1976). The Michigan Child Care Organization Act includes a similar provision. M.C.L.A. § 722.127 (1976). Other statutes require parental consent in certain instances for the medical treatment of their children.[11] Finally, a parent is liable for the acts of vandalism of his or her minor children. M.C.L.A. § 318.253 (1976). The actions of defendants are an exception to the general Michigan legislative scheme and have no basis in legislative enactments exhibiting the public policy of the State of Michigan.

▮ Nor are the actions of defendants comparable to those cases which uphold the state's interests under its police power. It

---

**10.** Cf., *Mercer v. Michigan State Bd. of Education,* 379 F.Supp. 580 (D.C., 1974) (three-judge court) (dismissing action challenging constitutionality of the above statutes). *Mercer* held that:

"Implicit in such a state of the law is the observation that a teacher does not have a right, Constitutional or otherwise, to teach what he sees fit, or to overrule the parents' decision as to which courses their children will take unless, of course, the State has in some manner delegated this responsibility to the teacher which is not the case here." *Id.* at 586.

Defendants here are in a position similar to that of the teacher in *Mercer.*

**11.** Parents of children in out-of-home care must consent to routine, non-surgical medical care. M.C.L.A. § 722.124a (1976). Parents must also consent before their minor children may donate blood. M.C.L.A. § 722.41 (1976) (by negative implication). Michigan provides, by statute, that a court may override a parent's refusal to give consent to medical services where "the child's health requires it." M.C.L.A. § 722.634 (1976).

must be emphasized here that plaintiff's prayer for relief includes a right to notice (and, implicitly, a right to counsel) in addition to a right to consent to their children's decision to use contraceptives. The defendants have not shown how a right to notice and consultation in the parents "will jeopardize the health or safety of the child, or have a potential for significant social burdens." *Yoder,* supra, 406 U.S. at 234, 92 S.Ct. at 1542.

While a requirement of a right of consent in the parents might lead to some of the problems *Yoder* refers to as justifying such action, there are no facts offered to justify a conclusion that a requirement of parental notice and consultation would in any way burden society or endanger the health and safety of the child. Such a requirement, rather, would result in better informed and better counseled decision-making on the part of the minor child. It is not contested that a parent who has nurtured and cared for a child over the course of its lifetime is in a better position to counsel and guide the minor than a social worker or public health physician whose contact with the minor is at best hurried or comes as part of a group "rap" session.

A decision as to whether or not to initiate sexual activity can be a traumatic experience for a child and may be a result of concerted peer pressure (or what a minor may perceive, rightly or wrongly, as the accepted norm of conduct among his or her peers). The medical risks of teen-age pregnancy are substantial, as I am painfully aware. But the risks of contraceptive pills are also substantial, as are the emotional problems resultant from too-early sexual activity. The very complexity of the decision commands the loving and supportive involvement of the minor's parents rather than the passing concern of a state-funded and state-controlled public health or social worker.

The cases supportive of defendant's position involved a direct relationship between

the activity of the individual and the legislative policy of public health and safety; for instance, immunization, *Jacobson,* supra; child labor, *Prince,* supra; and control of obscenity, *Ginsburg v. State of New York,* 390 U.S. 629, 88 S.Ct. 1274, 20 L.Ed.2d 195 (1968). Falling under this category would be Michigan statutes allowing physicians and public health clinics to treat minors for venereal disease, M.C.L.A. § 329.221, and drug abuse, M.C.L.A. § 335.-231, without their parents' consent.[12] Plaintiffs do not contest the validity of these statutes, admitting such provisions are justified because of the immediate necessity of protecting the health of the minor and of the overriding interest of the State in treating such problems to prevent their further spread. The challenged action does not exhibit a similar immediate necessity for the public health and safety.

In addition to the absence of a direct relationship between the evil sought to be prevented and the action taken in the pursuit of that goal, the implications of the action challenged here differ in substance from those upheld in the above cases. In the immunization, child labor, and obscenity cases, the governmental action did not intrude upon the delicate relationship between parent and child in the first of all societies, the family. Here, the actions of the defendants could profoundly affect or even destroy that relationship and the religious and moral upbringing of the child. Defendants have not shown a compelling interest justifying such action.

Even were the defendants to need only a reasonable basis for their actions, their argument must also fail. As was said in *Braunfeld v. Brown,* 366 U.S. 599, 607, 81 S.Ct. 1144, 1148, 6 L.Ed.2d 563 (1960):

> "[I]f the State regulates conduct by enacting a general law within its power, the purpose and effect of which is to advance the State's secular goals, the statute is valid despite its indirect burden on religious observance unless the State

---

12. The latter statute gives the treating physician the option to inform the minor's parents as to treatment given.

may accomplish its purpose by means which do not impose such a burden." The defendants have not shown that their purpose of preventing teen-age pregnancy and the risks incident thereto necessitate the action challenged here (i. e., total exclusion of the parents). *Prince,* supra, 321 U.S. at 170, 64 S.Ct. 438. I, therefore, find no overriding State interest which would permit defendants to distribute contraceptives to minors to the total exclusion of the minor's parents.

### (4) *Social Security Act.*

■ The Center is under contract with the State of Michigan to provide family planning services to AFDC and Medicaid recipients under provisions of the Social Security Act. 42 U.S.C. §§ 601 et seq.; 1396 et seq. The Center must conform to the rules and regulations promulgated by HEW. *King v. Smith,* 392 U.S. 309, 88 S.Ct. 2128, 20 L.Ed.2d 1118 (1968). Provisions of the statutes indicate these family planning services are to be provided to program recipients, including sexually active minors. 42 U.S.C. §§ 602(a)(15), 1396a(a)(8), 1396d(a)(4)(C). These statutes have been construed as forbidding a state statute requiring parental consent for minors seeking such services. *T____ H____ v. Jones,* 425 F.Supp. 873 (D.Utah, 1975), aff'd., 425 U.S. 986, 96 S.Ct. 2195, 48 L.Ed.2d 811 (1976). The affirmance by the Supreme Court was by summary order and was based solely upon the finding of the lower court that the Utah statute was in violation of the Supremacy Clause.

■ Plaintiffs do not attack the constitutionality of these Social Security statutes. As of the date of filing of this action, any decision as to the constitutionality of these statutes would require the seating of a three-judge court. Therefore, I am foreclosed from finding that plaintiffs have a constitutional right to consent to their minor child's reception of contraceptive services. Nothing, however, in the Social Security Act or *T____ H____* requires these family planning services to be given in the absence of parental notice and consultation, which rights plaintiffs also seek to enforce.

### III. CONCLUSION.

■ In the court's mind, the parental and familial rights asserted by the plaintiffs herein are sufficient to justify a requirement that minors not be afforded a birth control device or medication unless notice to their parents is provided in some manner.

The fundamental disagreement in this case is over the agency best suited to accommodate the needs of minors in their decision whether or not to use birth control devices. It is axiomatic that there is a natural tendency on the part of adolescents to "test" and rebel against parental authority. In the mind of this court it is important that family ties which are subject to a natural strain during the period of adolescence not be further riven by a state agency which, no matter how one views it, encourages independence from the family in the area of sexual mores. The attitude of the governmental authority in this case is perhaps best exemplified by the statements at page 7 of defendants' brief that "it is doubtful that the parents' input into the minor's decision to use contraceptives will necessarily improve the quality of advice already given the minor by a physician or a trained family planning expert." This is purely and simply a value judgment that the advice of quasi-official individuals is fully as valuable and important to minors as that of the minor's parents. It would seem that the very attraction of a family planning clinic is its impersonal nature and yet the decisions which the minor is being called upon to make involve the most personal considerations of all—life itself, both the life of the minor and the potential life of an unwanted child. These value judgments have traditionally been made in a family context, and the family, without question, has been the cornerstone of all society. Reduced to these terms then, we have the interests of the family contrasted with the interests of the State.

The argument that the interests are not really those of the family or the parents begs the question and ignores the fact that significant restrictions are placed upon the freedom of minors in such areas as alcoholic beverages, smoking, curfews, driver's licenses and availability of obscene materials. To say that such activities can be regulated by the State, but that parents have no rights whatsoever in a far more personal and private area (cf. *Griswold v. Connecticut*) is to give a prominence and presumption to governmental ability in the family areas which the court can simply not accept.

■ It is true, as set forth clearly in *Planned Parenthood of Central Missouri v. Danforth*, 428 U.S. 52, 96 S.Ct. 2831, 49 L.Ed.2d 788 (1976), that absolute prohibitions on contraceptive availability for minors is civilly unconstitutional. However, there is a clear recognition by the majority in the *Danforth* decision that "parental discretion, too, has been protected from unwarranted or unreasonable interference from the State" (Id. at 73, 96 S.Ct. at 2843), and we deal in this case with an area of unquestioned parental discretion. The *Danforth* majority simply holds that a blanket veto by a third party over the decision of whether or not to use contraceptive devices is unconstitutional. Implicit in the Court's opinion (Id. at 75, 96 S.Ct. at 2844) is the recognition that minors may well be immature and that restrictions other than a blanket veto would pass constitutional muster. The three separate opinions filed in addition to the majority opinion are even stronger in supporting the proposition that encouragement of minors to seek help and advice of their parents is a valid constitutional aim. Where the scales balance equally, a court ought not be prepared to blindly give precedence to governmental policies over parental rights and familial values—it must respect the position of parents who have brought teenagers to the point at which decisions regarding use of contraceptive devices will be made. A requirement of notice would afford parents an opportunity to do precisely what the defendants in this case wish to do, that is, alert a minor to the dangers, problems and consequences of sexual activity. In some instances the end result, in terms of contraceptive use and sexual activity, will be the same, in some it will be different. But presumably if parents are not even aware of a minor's interest in contraceptive devices, a notice requirement would provide the focus necessary to bring to bear parental involvement. Once aware, a decision may be reached in joint consultation with the parents, or a minor may prevail without parental consent, but in either event the value of family involvement would be afforded that minor.

■ The contrary argument that because the behavior of the minor may be altered, if parental notice is required, and therefore parental notice must be done away with, assumes that the role of parents is contrary to the best interests of the minor. Again, this assumption destroys the very foundation of all society and when the conflicting interests of the government and the family collide, courts must exercise every caution in protecting parental and familial values. While minors may find it difficult to communicate with parents, being forced to do so (taking the extreme view), may well strengthen familial ties, whereas providing an impersonal outlet, such as a family planning clinic, can have no other effect than to drive a wedge into a gap which naturally occurs at this time of life.

The importance of parental input into the decision, from both a social and medical standpoint, is sufficient for this court to find that the dispensation of contraceptive medication and devices to minors, without adequate notice to parents, constitutes an unconstitutional interference with parental rights and familial values.