John DOE, Jane Doe, Thomas M. Grost and Cora W. Grost, Individually and on behalf of all others similarly situated, Plaintiffs-Appellees,

v.

Cathy E. IRWIN, George Gross, Elinor Holbrook, Gilda Richardson, Marie Vande Bunte, Mary Kay Wickens, David Holden and Mary Woods, in their official capacities, Defendants-Appellants.

No. 78–1056.

United States Court of Appeals, Sixth Circuit.

Argued Dec. 10, 1979.

Decided Feb. 26, 1980.

Peter A. Cohl, Larry A. Salstrom, Lansing, Mich., for defendants-appellants.

Stuart D. Hubbell, Hubbell, Blakeslee & Houlihan, Traverse City, Mich., for plaintiffs-appellees.

Edward M. Wise, Gen. Counsel, Detroit, Mich., for amicus curiae American Civil Liberties Union of Michigan.

Before WEICK and LIVELY, Circuit Judges, and PHILLIPS, Senior Circuit Judge.

LIVELY, Circuit Judge.

This case involves the distribution of contraceptives to minors, without notice to their parents, by a publicly operated family planning clinic. The plaintiffs are parents of a 16-year-old daughter who received contraceptives from the clinic and other parents of two teen-age children who live in the area served by it. A class was certified by the district court consisting of "all parents residing in the county of Ingham who have children between the onset of puberty and the age of majority under their parental care, custody and control, and who, as parents, are opposed to having their children receive contraceptive information, devices and medication without the knowledge and against the wishes of the parents who comprise this class." The defendants are administrators of the Tri-County Family Planning Center (the Center) and board members and administrators of the Ingham County, Michigan, Health Department.

I.

Many facts concerning the operation of the Center were stipulated. It is operated in Lansing by the Ingham County Health Department under contract with the Michigan Department of Public Health. The original defendants and their successors are responsible for the policies and operations of the Center. The Center serves adults as well as minors. Minors are served without regard to whether or not they are emancipated. Neither the Center nor any of its services related to minors are advertised, and minors are not sought out or encouraged to attend the Center by any of the defendants or any other county official. Minors are permitted to come to the Center either with or without parental consent. Contraceptives are prescribed and distributed to minors both with and without parental knowledge or consent. There is no charge for devices and medication distributed by the Center.

A weekly "rap session" is conducted by the Center. The rap sessions are educational. They deal with birth control methods, the responsibilities of being sexually active and the desirability of communicating with parents and others involved in a decision to engage in sexual activities. No minor is served by the Center until he or she has attended a rap session. Female minors who return to the Center after attending a rap session are required to give a complete medical history and to undergo a physical examination. If any medical problems are indicated, the applicant is referred to her family physician or another physician. Only if no medical problems are indicated or discovered is a contraceptive device or medication prescribed to a minor.

In the fiscal year immediately prior to the filing of this action the Center distributed contraceptive devices or medication to 623 females who were 17 years old, 466 who were 16, 210 who were 15, and 74 who were 14. According to a study conducted at the Center, 88 percent of the minors surveyed lived with their parents, 89 percent had intercourse at least one time before visiting the Center and 10 percent of the female minors had been pregnant at least once. A great majority of those served by the Center receive birth control pills. Though some patients receive inter-uterine devices (IUD), the Center will not insert an IUD in a minor without parental consent. No abortions or sterilizations are performed at the Center.

In her deposition, the program administrator of the Center described the weekly rap sessions in great detail. The sessions are held at the county health office, and each lasts approximately 2½ hours. The sessions are intended to give factual information about birth control and human reproduction. They are conducted by a woman with a master's degree in social work, assisted by medical students and university students majoring in social work. Those attending the sessions are encouraged to ask questions, and the leaders attempt to deal with misinformation about birth control. The pros and cons of various methods of birth control are discussed, including possible side effects. Parents are encouraged to attend if they inquire, but no effort is made to seek their attendance. Those who attend are encouraged to discuss their sexual interests with their parents, and those conducting the sessions offer to help the young people talk with their parents about the subjects covered in the sessions.

Every minor who attends a rap session is required to register and fill out a form. Those who desire to proceed after the discussions at the rap session must make an appointment at the Center; many who attend the rap sessions never go on to the Center. At the first visit to the Center a personal medical history is taken and a physical examination is conducted. If there are no indications of medical problems, female patients are usually given a three-month supply of birth control pills. If a patient returns for an additional supply, a number of questions are asked to determine whether any symptoms have been noted which indicate side effects. In addition, she is checked physically and certain tests are made. The decision on whether a particular individual will receive contraceptives is made in every case by a physician. Minors are not asked if they have the consent of their parents before contraceptives are given to them, and the Center does not notify parents either that their children have attended a rap session or that they are receiving contraceptives.

The administrator stated that the personnel of the Center do not advocate that unmarried teenagers become sexually active. However, they try to deal with individuals "where they are" and promote their physical and psychological well-being. She described the Center as a "non-judgmental" organization which makes a service available to the community for those people who wish to use it. A physician who is a member of the Department of Gynecology at Michigan State University testified that his department acts as medical director of the Center. The department issues guidelines for personnel of the Center and maintains its quality of medical care. The doctor testified that the physical examinations, which include a check for venereal disease, are extremely thorough. He must personally approve the distribution of contraceptives to a patient where the tests and examinations indicate any "deviation from the normal." Personnel of the Center are directed to make an evaluation of the level of understanding of each patient. This witness concluded that most minors who come to the Center understand the benefits of contraception versus pregnancy and the hazards of any method of contraception chosen.

Though none of the factual testimony about operations of the Center was disputed, witnesses for the plaintiffs took sharp issue with opinions expressed by the administrator and medical director. One witness, who operates a marriage clinic in Los Angeles, testified to his opinion, based on many years of experience, that adolescents do not have sufficient maturity to utilize contraceptives for the purpose of preventing pregnancy. He further testified that the non-judgmental approach of the Center is viewed by teenagers as a green light for the use of contraceptives. In addition to stating his belief that programs such as that carried on by the Center do not reduce unwanted pregnancies, this witness stated that family planning clinics contribute to an epidemic in venereal diseases which is known to exist in the United States at the present time. Finally, the witness testified that family stability and trust among family members are undermined by practices of

the Center because parents feel that an outsider has usurped their rightful position of authority over their children. This witness had training in sociology and psychology and a Ph.D. degree in communications.

A medical witness for the plaintiffs who engages in family practice testified to having a wide experience with adolescent patients. This physician testified extensively with respect to the physical and psychological risks which he and others associate with the use of various types of contraceptives by adolescent females. It was his opinion that most adolescents do not have the capacity to make decisions on birth control and to understand what is involved in choosing and using a contraceptive. This witness believed that the availability of contraceptives for minors increases promiscuity and the incident of venereal disease. He testified that the activities of organizations such as the Center would be perceived by teenagers as authority figures "condoning fornication."

The defendants presented a medical witness, certified in pediatrics and public health, who is Professor of Population Planning at the University of Michigan. He testified to his opinion that the use of contraceptives by teenagers reduces pregnancies and that family planning clinics help avert unwanted births. He felt that the distribution of contraceptives to teenagers has very little, if any, effect on the "slight increase" in promiscuity in this country. The witness also stated he had no doubt that a requirement for parental consent would have a negative effect on the access that minors have to a family planning clinic. He detailed the health hazards to teenage mothers and their babies, and stated there would be many more unwanted babies if teen-age girls were not able to obtain contraceptives without their parents' consent.

## II.

The district court found that the Center's practice of distributing contraceptives to minors without notice to their parents violates constitutional rights of the parents.

*Doe v. Irwin*, 428 F.Supp. 1198 (W.D.Mich. 1977). In the order granting a permanent injunction which accompanied the district court's opinion, the defendants were directed "to cease and desist from distributing contraceptives and contraceptive devices to minor, unemancipated children in the absence of notice to the parents of such children and a reasonable opportunity for the parents of such children to consult with their children as to the decision of the child whether or not to obtain contraceptives or contraceptive devices." The defendants appealed, and this court remanded the case for consideration by the district court in light of *Carey v. Population Services Int'l.*, 431 U.S. 678, 97 S.Ct. 2010, 52 L.Ed.2d 675 (1977), which was decided by the Supreme Court after the district court rendered its decision. Following remand the district court found that *Carey* did not require a different result. A second opinion was issued, 441 F.Supp. 1247 (1977), and the previous injunctive order was readopted and reaffirmed. The order was stayed pending appeal.

Though the district court made a number of findings of fact with reference to the testimony of various witnesses, its decision appears to be based primarily upon this conclusion of law:

[I]n the absence of overriding rights in their minor children and in the absence of compelling State interest, I conclude that parents have a constitutionally protected right to participate in the very important decisions of their minor, unemancipated children as to whether or not to initiate sexual activity or to undertake the substantial medical risks of certain contraceptives. The State, quite simply, in the absence of a compelling interest, may not, by statute, regulation, or action, totally exclude the parents of the child from such a momentous decision. Nor may it supplant the advice, love, understanding, and control of the parent with state-funded and state-controlled physicians, social workers, and counselors. Although the goal of the defendants, acting under color of state law, may be well intended, they

are not warranted in insinuating their way into the delicate relationship between parent and child. 428 F.Supp. at 1209–10.

In its opinion following remand, the district court discussed a number of cases in which the Supreme Court has recognized the right of parents to the "custody, care, and religious and moral education of their children . . . ." 441 F.Supp. at 1249. Consideration of these decisions and various commentaries led the district court to the following conclusion:

> Parental authority is plenary. It prevails over the claims of the state, other outsiders, and the children themselves. There must be some compelling justification for interference. *Id.*

The district court recognized that the Center does not prohibit parents in any way from inculcating their children with their religious beliefs. However, the court reasoned that "it is an invasion of parental rights to require them to anticipate in advance the multitude of situations which may act upon their children and prepare them in advance to deal with any moral question that may arise in the course of that child's young life, particularly where the parent is prevented from being made aware of the actions of a state-run agency which facilitate a situation inimical to the values the parents are attempting to teach their children." 441 F.Supp. at 1253. The foregoing quotation and other statements in the opinion[1] indicate a finding by the district court that the effect of the Center's practice of not notifying parents is equivalent to the state's supplanting the parents with respect to their children's decisions in regard to sexual activity and birth control.

## III.

The parties and *amici curiae* have briefed a number of issues quite thoroughly. Many of these issues will not be discussed in this opinion because they are not necessary to a decision. We recognize that three separate sets of rights are involved—those of parents, those of children and those of the State of Michigan, acting through the Center. We will first attempt to identify the rights and the constitutional principles which underlie them before applying these principles to the particular issues in this case.

### A.

■ The constitutional right of persons who desire to use the services of the Center is the right of personal privacy. In a series of cases dealing with laws affecting the right to abortion, the Supreme Court has held consistently that a woman's decisions concerning child-bearing are within the most intimate area of personal privacy. *E. g., Roe v. Wade,* 410 U.S. 113, 152, 93 S.Ct. 705, 726, 35 L.Ed.2d 147 (1973); *Whalen v. Roe,* 429 U.S. 589, 599–600, 97 S.Ct. 869, 876–877, 51 L.Ed.2d 64 (1977). One of the first explicit recognitions of the right of privacy came in a case dealing with a statute which prohibited the use of contraceptives. *Griswold v. Connecticut,* 381 U.S. 479, 85 S.Ct. 1678, 14 L.Ed.2d 510 (1965). Though the state has somewhat broader authority to regulate the conduct of children than that of adults, minors do possess a constitutionally protected right of privacy. *Bellotti v. Baird,* 443 U.S. 622, 99 S.Ct. 3035, 3043–44, 61 L.Ed.2d 797 (1979); *Carey v. Population Services Int'l.,* 431 U.S. 678, 692–93, 97 S.Ct. 2010, 2019–2020, 52 L.Ed.2d 675 (1977); *Planned Parenthood of Missouri v. Danforth,* 428 U.S. 52, 74–75, 96 S.Ct. 2831, 2843–2844, 49 L.Ed.2d 788 (1976); *Wynn v. Carey,* 582 F.2d 1375, 1383–84 (7th Cir. 1978) (*Wynn* was re-affirmed and a permanent injunction granted in 599 F.2d 193, 196 (1979)). As with adults, the minor's right of privacy includes the right to obtain contraceptives. *Carey v. Population Services, supra.*

---

1. *E. g.,* " . . . so long as the defendant Center continues to treat children in a manner whereby the parents of those children *cannot* become aware of the contact . . . ." 441 F.Supp. at 1253 (emphasis added); "these actions are carried out in an atmosphere of secrecy which fails to put parents on notice as to the state's actions relative to their children . . ." *Id.*

### B.

■ The Supreme Court has long recognized the right of parents to the care, custody and nurture of their children as a liberty interest protected by the Fourteenth Amendment. *See Meyer v. Nebraska,* 262 U.S. 390, 43 S.Ct. 625, 67 L.Ed. 1042 (1923); *Pierce v. Society of Sisters,* 268 U.S. 510, 45 S.Ct. 571, 69 L.Ed. 1070 (1925); *Prince v. Massachusetts,* 321 U.S. 158, 64 S.Ct. 438, 88 L.Ed. 645 (1944); *Wisconsin v. Yoder,* 406 U.S. 205, 92 S.Ct. 1526, 32 L.Ed.2d 15 (1972); *Parham v. J. R.,* 442 U.S. 584, 99 S.Ct. 2493, 2504, 61 L.Ed.2d 101 (1979). The Court has defined and explained the basis of parental rights in various terms:

> The child is not the mere creature of the state; those who nurture him and direct his destiny have the right, coupled with the high duty, to recognize and prepare him for additional obligations. *Pierce v. Society of Sisters, supra,* 268 U.S. at 535, 45 S.Ct. at 573.

> It is cardinal with us that the custody, care and nurture of the child reside first in the parents, whose primary function and freedom include preparation for obligations the state can neither supply nor hinder. *Pierce v. Society of Sisters, supra.* And it is in recognition of this that these decisions have respected the private realm of family life which the state cannot enter. *Prince v. Massachusetts, supra,* 321 U.S. at 166, 64 S.Ct. at 442.

> The history and culture of Western civilization reflect a strong tradition of parental concern for the nurture and upbringing of their children. This primary role of the parents in the upbringing of their children is now established beyond debate as an enduring American tradition.

> \*   \*   \*   \*   \*   \*

> The duty to prepare the child for "additional obligations," referred to by the Court, must be read to include the inculcation of moral standards, religious beliefs, and elements of good citizenship. *Wisconsin v. Yoder, supra,* 406 U.S. at 232, 233, 92 S.Ct. at 1542.

### C.

■ Every state has a substantial interest in the health and welfare of all its inhabitants. The Supreme Court has recognized that a state has "an independent interest in the well-being of its youth." *Ginsberg v. New York,* 390 U.S. 629, 640, 88 S.Ct. 1274, 1281, 20 L.Ed.2d 195 (1968). Michigan's interest in protecting minor females from the physical and emotional hazards of unwanted pregnancies led it to establish clinics such as the Center. This is a legitimate state interest.

### IV.

■ The district court recognized the existence of the three sets of rights. However, it concluded that the state's interest is not "compelling" and that the right of parents to participate in the decisions of their children that involve sexual activity and birth control outweighs the right of minors to make these decisions independently. This conclusion led the court to require the state to impose a limitation on the right of minors which the state had not chosen to impose. We believe this was error.

### A.

The Supreme Court has not squarely decided whether a state may impose a requirement of parental notice, as opposed to parental consent, as a condition of a minor's receiving an abortion. *Bellotti v. Baird, supra,* —— U.S. at ——, 99 S.Ct. at 3053 n. 1 (Stevens, J., concurring). However, the Seventh Circuit held unconstitutional an abortion statute that resulted in parental notice in all cases. *Wynn v. Carey, supra,* 582 F.2d at 1386–88, and at least one district court has held such a notice requirement unconstitutional. *Women's Community Health Center, Inc. v. Cohen,* 477 F.Supp. 542, 546–48 (D.Me.1979). Neither has the Supreme Court determined whether parental_ notice may be required before birth control information, devices and medication may be distributed to unemancipated minors. Though this issue was not involved in *Carey v. Population Services Int'l., supra,*

the district court found support in the opinions of various Justices for its conclusion that such a requirement would be permissible. *Doe v. Irwin, supra,* 441 F.Supp. at 1257–60. A three-judge district court in *T___ H___ v. Jones,* 425 F.Supp. 873 (D.Utah 1975), affirmed on statutory grounds only, 425 U.S. 986, 96 S.Ct. 2195, 48 L.Ed.2d 811 (1976), came to a similar conclusion several years before *Carey* was decided. *Id.* at 882.

## B.

The district court's conclusion that the Center's practice of distributing contraceptive devices to minors without notifying parents is unconstitutional was based upon the previously noted Supreme Court decisions which define parental rights. The plaintiffs rely on the same authorities on appeal.

There is one fundamental difference between all the cited cases and the present one. In each of the Supreme Court cases the state was either requiring or prohibiting some activity. In *Meyer v. Nebraska, supra,* the state forbade the teaching of foreign languages to pupils who had not passed the eighth grade. The Court held the statute not reasonably related to any end within the competency of the state and violative of parents' Fourteenth Amendment right to liberty. In *Pierce v. Society of Sisters, supra,* the statute required all children between the ages of 8 and 16 to attend public schools. The Court found that the law unreasonably interfered with the liberty interest of parents to direct the upbringing and education of their children, including the right to send them to accredited private schools. Again in *Wisconsin v. Yoder, supra,* the law in question

made school attendance compulsory. The Court held that Amish parents' First Amendment rights to the free exercise of their religion were infringed by the attendance requirement. In *Prince v. Massachusetts, supra,* child labor laws were construed to prohibit street sales of religious tracts by children. In that case the Court upheld the conviction of a parent who contended that these laws unreasonably interfered with her right of free exercise of religion and her parental rights. In so holding, the Court determined that a state's "authority is not nullified merely because the parent grounds his claim to control the child's course of conduct on religion or conscience." 321 U.S. at 166, 64 S.Ct. at 442.

## C.

The State of Michigan, acting through the Center and defendants, has imposed no compulsory requirements or prohibitions which affect rights of the plaintiffs. It has merely established a voluntary birth control clinic. There is no requirement that the children of the plaintiffs avail themselves of the services offered by the Center and no prohibition against the plaintiffs' participating in decisions of their minor children on issues of sexual activity and birth control. The plaintiffs remain free to exercise their traditional care, custody and control over their unemancipated children. Assuming the factual findings (as opposed to assumptions)[2] of the district court are correct, we can find no deprivation of the liberty interest of parents in the practice of not notifying them of their children's voluntary decisions to participate in the activities of the Center.[3]

**2.** In its opinions the district court held that the state may not "totally exclude" the parents from momentous decisions of their children and "supplant" the advice, love, etc. of the parents with state-funded and state-controlled personnel. 428 F.Supp. at 1210. To the extent these statements represent findings of fact by the district court, such findings are clearly erroneous. There was no evidence that parents are excluded from any decisions or supplanted by the activities of the Center. The uncontra-

dicted evidence was that personnel of the Center encourage minors to involve their parents in their decisions concerning sexual activity and birth control, and even offer to help bring the parents into discussions of these subjects.

**3.** This is true even though the district court felt that the religious beliefs of plaintiffs are "implicated" in the parents' liberty interest. 441 F.Supp. at 1251. *Cf. Prince v. Massachusetts, supra,* 321 U.S. at 166, 64 S.Ct. at 442.

We do not find the support for plaintiffs' position which they and the district court perceive in *Carey v. Population Services, Int'l., supra.* That case concerned a statute which, *inter alia,* made it a crime to sell or distribute contraceptives of any kind to a minor under sixteen. The Court found this total prohibition to be violative of the privacy right of minors who made the personal decision to use such devices. There was no majority opinion on this particular issue. The various opinions of the Justices do not indicate a belief that parents have a constitutional right to be notified by a public facility which distributes contraceptives to unemancipated minors.

Since we find no unconstitutional interference with the plaintiffs' rights as parents, there is no need to consider whether a "compelling" state interest was involved. For the same reason, it is not necessary to determine whether parental rights "outweigh" those of their minor children.

### V.

The question in this case is not whether a state may impose a condition which would limit the right of privacy of the minors whose interests are involved. Rather, it is whether the Constitution requires such a condition. In the absence of a constitutional requirement for notice to parents, it is clearly a matter for the state to determine whether such a requirement is necessary or desirable in achieving the purposes for which the Center was established. There is no basis for a federal court to impose conditions in the absence of an overriding constitutional requirement.

The desire of the parents to know of such activities by their children is understandable. However the only issue before the district court and this court is whether there is a constitutional obligation on the Center to notify them. The record before us does not establish that the Center infringes a constitutional right of the plaintiffs by its practice of distributing contraceptive devices and medication to unemancipated minors without notice to their parents.

The judgment of the district court is reversed with directions to dismiss the complaint. No costs on appeal.