UNITED STATES of America,
Appellant,

v.

Clara B. PENN, a/k/a Clara B.
Alexander, Appellee.

No. 77–3918.

United States Court of Appeals,
Ninth Circuit.

May 15, 1980.

Rehearing Denied July 28, 1980.

Goodwin, Circuit Judge, dissented and filed opinion in which Kennedy, Hug and Tang, Circuit Judges, joined.

Kennedy, Circuit Judge, dissented and filed an opinion in which Hug and Tang, Circuit Judges, joined.

Fletcher, Pregerson and Ferguson, Circuit Judges dissented from denial of rehearing en banc.

John C. Merkel, U. S. Atty., Seattle, Wash., on brief; Christine McKenna, Seattle, Wash., for appellant.

James A. Vonasch, Seattle, Wash., on brief; Jack A. Richey, Seattle, Wash., for appellee.

Before WRIGHT, CHOY, GOODWIN, WALLACE, SNEED, KENNEDY, ANDERSON, HUG, and TANG, Circuit Judges.*

CHOY, Circuit Judge:

The district court suppressed a jar of heroin taken from the defendant's backyard, and the government appealed under 18 U.S.C. § 3731.[1] After a panel of this court had concluded that reversal was necessary, the panel suggested that the court consider the question en banc. The panel decision has been withdrawn, and the following opinion reflects the view of the majority of the court en banc.

### I. Statement of the Case

Two years of Seattle police investigation led officers to believe that Clara Penn was distributing heroin from her residence. Evidence sufficient to justify a search warrant indicated that some of the Penn children were buying items used in the packaging and distribution of narcotics and that, when a delivery was to be made to a customer, one of the children was sent to retrieve drugs from a cache believed to be in the backyard.

A state magistrate issued a search warrant which described the premises to be searched as the residential premises, including the yard. The police surrounded the house, entered, and seated in the living room the approximately 10 persons found on the premises. Clara Penn's children,

* Judges Ely and Trask were active members of the court at the time the case was submitted but took senior status before the case was decided and did not participate in the decision. *See United States v. American-Foreign Steamship Corp.*, 363 U.S. 685, 80 S.Ct. 1336, 4 L.Ed.2d 1491 (1960).

Chief Judge Browning did not participate in this case.

1. Section 3731 provides in relevant part:

An appeal by the United States shall lie to a court of appeals from a decision or order of a district courts [sic] suppressing or excluding evidence or requiring the return of seized property in a criminal proceeding, not made after the defendant has been put in jeopardy and before the verdict or finding on an indictment or information, if the United States attorney certifies to the district court that the appeal is not taken for purpose of delay and that the evidence is a substantial proof of a fact material in the proceeding.

ranging in age from 5 to 22, were among them. They, along with the rest of the group, were uncooperative and combative.[2] In taunting the police they revealed their awareness of drug-related activities.[3]

Officers conducting the search found a quantity of cocaine in the Penn home. After a half hour of looking they had found no heroin. At that point, Reggie, the youngest of Clara Penn's children (age 5), asked to go to the bathroom. A police officer took him. While in the bathroom with the child the policeman asked Reggie (as an "afterthought," according to the officer's testimony) if Reggie knew where the little balloons (of heroin) were hidden. Reggie nodded in the affirmative to the officer's question, indicating that he knew where the heroin could be found.

While the officer had good reason to believe that Clara Penn's children were assisting her in her drug operations and that some of them might know where the heroin was located, there is no evidence that Reggie specifically was known to be a participant in his mother's drug dealings.

Because of a commotion outside the bathroom door, the officer did not pursue his conversation with Reggie. But 10 minutes later, when the commotion had ended, the officer spoke with Reggie again, this time in the kitchen. The officer asked Reggie if Reggie would take him out to where the heroin was located. Reggie answered yes,

then hesitated. The officer then offered to give Reggie five dollars if Reggie would show him the location of the cache. The boy thereupon walked out to the backyard and pointed to some soft sod. Under the sod the police discovered a glass jar containing 132.9 grams of heroin. Police later found in the yard, but without Reggie's assistance, a second jar containing 14.6 grams of heroin. (Because of the hostility of Reggie's brothers, the officer was unable to give Reggie the five dollars.)

After a state prosecution was terminated following a successful suppression motion,[4] the federal government prosecuted Clara Penn under 21 U.S.C. § 841(a)(1) for possession of controlled substances with intent to distribute them. The prosecution sought to introduce the state-suppressed evidence taken from the yard. On motion by the defense, the district court suppressed the jar of heroin that had been found with Reggie's help,[5] on the ground that the police conduct violated the due process clause of the Fifth Amendment. According to the court's memorandum:

> The bribery of a child of tender age by a policeman in order to obtain evidence to be used against a parent represents police conduct which is shocking to the conscience and is, in the opinion of this Court, so violative of the decencies of civilized conduct to be a deprivation of due process. *Rochin v. California*, 342 U.S. 165, 72 S.Ct. 205, 96 L.Ed. 183 (1952).

2. Police report, and defendant does not deny, that she urged her children through much of the episode "not to talk to the officers, ... to hate whitey and to hate the pigs."

3. According to the officer who eventually found the heroin, the children "were continually . . . talking in terms about dope, we were not going to find anything there . . . . One of the older children was making remarks about how he could beat the police in drug dealing, that he was too smart for the pigs to catch them."

4. The record from the district court indicates that sometime prior to the proceedings before that court the State of Washington had sought to charge Clara Penn in Washington state court for possession and distribution of narcotics. The charges were supported in part by the same contraband seized by the Seattle police as that under review here. In a preliminary pro-

ceeding, the state court suppressed the heroin found in the backyard of the Penn home. It relied on the Fourth Amendment, noting that

> [t]he enticement of 5 year old Reginald Penn with five dollars to disclose the whereabouts of contraband is clearly an unreasonable search and seizure in light of the Fourth Amendment's protection. . . . The contraband found in the backyard of the residence was found as the result of an unreasonable search and seizure and shall be suppressed.

5. The government could proceed with the prosecution in this case using as evidence the unsuppressed 14.6 grams of heroin found without Reggie's aid. However, it might well have a hard time securing a conviction on the intent-to-distribute charge with approximately one-half ounce of heroin admissible at trial.

## II. Constitutional Grounds

### A. Due Process

■ Courts should tread gingerly when faced with arguments that the "fundamental fairness" component of the Fifth Amendment's Due Process Clause requires the suppression of evidence. Only the most serious cases, which truly shock the conscience as well as the mind, call for invocation of the Constitution itself rather than of our prudential powers. The Constitution was designed to define the boundaries and framework of civilized and orderly government; it is not to be used to convert into a command a judge's every notion of what is morally best. But when the truly outrageous case, "shocking to the universal sense of justice," is before us, it is our duty to uphold the Constitution and invoke the Due Process Clause of the Fifth or Fourteenth Amendment. *Betts v. Brady,* 316 U.S. 455, 462, 62 S.Ct. 1252, 1256, 86 L.Ed. 1595 (1942), *overruled on other grounds, Gideon v. Wainwright,* 372 U.S. 335, 83 S.Ct. 792, 9 L.Ed.2d 799 (1963).

The district court below relied on *Rochin v. California,* 342 U.S. 165, 72 S.Ct. 205, 96 L.Ed. 183 (1952) (forcible insertion and use of stomach pump), to suppress the evidence, on the ground that the police tactic used to obtain the evidence shocked the conscience. It was technically incorrect to rely on *Rochin* ; we have strictly limited the *Rochin* line of precedent to cases of physical assault on a suspect's person. *See Rivas v. United States,* 368 F.2d 703, 710 (9th Cir. 1966), *cert. denied,* 386 U.S. 945, 87 S.Ct. 980, 17 L.Ed.2d 875 (1967). Nonetheless, the *Rochin* line represents only a subset of the broader category of due process violations by police in the course of investigations, *see United States v. Russell,* 411 U.S. 423, 431–32, 93 S.Ct. 1637, 1642–43, 36 L.Ed.2d 366 (1973), and Penn's case conceivably could fall within the broader category.

■ We hold, however, that it does not, although we disapprove of the police tactic used here. Due process arguments are to be "tested by an appraisal of the totality of facts in a given case." *Betts v. Brady,* 316

U.S. at 462, 62 S.Ct. at 1256. Under the facts of this case, the tactic did not violate the Fifth Amendment; under the facts of another, it might. *See id.*

Penn's case is based on a combination of factors that, considered individually, are universally agreed not to violate due process. Reggie (1) was bribed to give information; (2) was a very young child; and (3) was a close relative of Clara Penn—indeed, her son. But the police may pay informants to give information; very young children may aid criminal investigations; and sons may inform or testify against mothers.

Moreover, we think that there is general agreement that the combination of any two of these factors would not violate due process. A very young child may be given money in exchange for information about a non-family member; an adult son (or brother, or spouse) may be paid to inform against his mother, etc.; and a very young son may freely inform or testify against his mother.

Indeed, there are situations where all three factors may be said to be present, and no due process violation appears. If a mother's picture is on a reward poster and her very young son, having learned its import, offers to reveal to the police her hiding place, the police are not obligated to refuse to hear the information or to withdraw the reward offer as to the son. Or suppose that a bruised, very young child enters a police station and says, "Every day in my house I fall down the stairs and get hurt. I need a new home. Please send me to one." The police correctly deduce that his mother is beating him, but respond, "We can't give you a new home just because you fall down stairs. You'd have to give us a better reason." Eventually the child accepts the "bribe" of the safe home, fearing another beating if he returns to his family home, and reveals the fact of the beatings. The mother is arrested and tried for child abuse. Consider, finally, Judge Goodwin's example of a bribe of a young son to reveal the location of an underground box where his parents' kidnap victim is suffocating.

We do not look on these three analogies, which may be distinguishable (at least in tone), as dispositive. Instead, we look to the other facts in the case that militate against a finding of a due process violation. These include:

(1) The police had probable cause to suspect Clara Penn of heroin dealing.

(2) The police had a quite broad, but undisputedly valid, search warrant and were legitimately in the house.

(3) The policeman had a legal right to be alone with Reggie in the bathroom and the kitchen.

(4) The police never threatened or badgered Reggie.

(5) The police did not trick or deceive Reggie.

(6) The police conduct violated no law.

(7) The police had reason to believe that Clara Penn involved her children in her drug operations.

(8) Before the bribe was offered, Reggie told the policeman he knew where the heroin was hidden, and in fact he did know.

(9) Heroin dealing is an extremely serious crime, and the government's interest in discovering and punishing dealers is correspondingly strong.

(10) It was and is not a regular practice of the Seattle or any other police department to bribe young children to inform against their parents. This was an isolated incident with minimal potential for repetition.

Judge Goodwin points out that the police had a valid search warrant for the yard, and that if Reggie had not cooperated they would have dug up the whole yard to find the heroin. (Indeed, a second jar of heroin was independently dug up soon after, and it is undisputed that this jar was untainted evidence.) These facts argue both for and against a finding of a due process violation. On one hand, the unnecessariness of the police tactic underscores its disagreeable-ness. On the other hand, since the evidence would have been obtained in any event it does not seem fundamentally unfair to admit it. On balance, this factor does not persuade us to find a Fifth Amendment violation.

Judge Goodwin tells us that our holding undermines the interests of preserving family units and the exchange of information within them. From the viewpoint of the individual, these interests may be significant ends in and of themselves. But from the viewpoint of society and the law, these interests are also, and perhaps primarily, important as means to a greater end. "Our decisions establish that the Constitution protects the sanctity of the family precisely because the institution of the family is deeply rooted in this Nation's history and tradition. It is through the family that we inculcate and pass down many of our most cherished values, moral and cultural." *Moore v. City of East Cleveland*, 431 U.S. 494, 503–04, 97 S.Ct. 1932, 1938, 52 L.Ed.2d 531 (1977) (plurality opinion) (footnotes omitted).

When pondering how deeply our consciences are shocked by the police's intrusion into the Penn family's circle of confidence, we would not fulfill our duty to consider "the totality of facts," *Betts v. Brady*, 316 U.S. at 462, 62 S.Ct. at 1256, unless we took into account what manner of family unit it was. It was a family unit in which the mother involved her children deeply in the actual operation of her heroin-dealing business.[6] Perhaps even 5-year-old Reggie was involved, for he knew exactly where in the backyard the heroin was buried.

In *Blackford v. United States*, 247 F.2d 745 (9th Cir. 1957), *cert. denied*, 356 U.S. 914, 78 S.Ct. 672, 2 L.Ed.2d 586 (1958), we upheld against a due process challenge evidence obtained by a rectal search of a physically resisting suspect. Judge Chambers, concurring, wrote:

When Rochin was announced I was enthusiastic about it. I still am.

---

**6.** It was also a family unit in which hate for "whitey" and the "pigs" was inculcated. *See* note 2 *supra*.

But as I see it, the Supreme Court's policy is to uphold human dignity. . .

But here it was Blackford who created, who first takes us into this disgusting sequence. He made the deposit in his body . . .. What the officers did was not torture or abuse. I do not say that the depraved have no rights. But I do say that to my sensibilities all of the shockingness was Blackford's.

*Id.* at 754; *accord, Rivas v. United States,* 368 F.2d at 710; *King v. United States,* 258 F.2d 754, 755 & n.6 (5th Cir. 1958), *cert. denied,* 359 U.S. 939, 79 S.Ct. 652, 3 L.Ed.2d 639 (1959). Analogously, the information was in Reggie's mind because Clara Penn put it there for her own criminal purposes. She did so even though to put it there was disgusting. The police used disagreeable means to extract the information, but "to [our] sensibilities all of the shockingness was [Penn's]."

Tacitly conceding the force of this argument, Judge Goodwin argues that the presumption of innocence forces us to regard the Penn family not as a criminal one but as an innocent, protection-worthy one. Whatever the applicability of the presumption of innocence in other contexts, *see generally Bell v. Wolfish,* 441 U.S. 520, 533, 99 S.Ct. 1861, 1870, 60 L.Ed.2d 447 (1979) (presumption inapplicable to pretrial matters), the question here is not guilt or innocence, but the nature of the relationships within the Penn family unit. At any rate, we should not let any presumption blind us to the nature of the Penn family's exchange of information, when our duty is to consider "the totality of facts." Moreover, before the bribe was offered Reggie had already told the policeman he knew where the heroin was hidden, thus rendering quite hollow any presumption of innocence and any presumption of normal family roles and affairs. Viewing "the totality of facts," we find that the police intrusion into the circle of family confidence here does not shock the universal sense of justice.

Finally, Judge Goodwin says that when a more mature Reggie realizes that his youthful decision sent his mother to jail, he will be left with "permanent scars" and "irreparable psychological damage." Sadly, this may be true. But, when we consider the alternative, this possibility does not shock our consciences. Reggie might equally well suffer "permanent scars" and "irreparable psychological damage" from the reflection that his mother led him to spend his childhood spreading heroin and misery throughout his community. On balance, we cannot adopt this ground for affirming the suppression order.

It is urged to us that we should not limit our vision to the facts of this case, for a reversal of the suppression order here would lead to systematic government programs to "persuade" young children to inform against their parents, as in the societies created by George Orwell and Adolf Hitler. If we agreed with this logic, we would of course affirm the district court. We have no reason to believe, however, that this kind of information-gathering method is or will become anything remotely approaching standard procedure in any law enforcement community in the United States.

### B. *Fourth Amendment*

Because the district court relied on the Fifth Amendment to suppress the challenged evidence, it did not reach Penn's Fourth Amendment argument. We hold that Clara Penn cannot invoke the Fourth Amendment to exclude the evidence from her trial because the search was not constitutionally "unreasonable" and because no legitimate expectation of privacy of hers was violated.

■ The constitutional "reasonableness" of the search for and seizure of the heroin was established by the valid search warrant. Such initial "reasonableness" can be vitiated, however, by the manner in which the police conducted the search, even if the conduct did not rise to the shocking level of a due process violation.[7] *See Dalia v. Unit-*

---

7. A warranted search is unreasonable if it exceeds in scope or intensity the terms of the warrant. *Cf. Terry v. Ohio,* 392 U.S. 1, 17–19, 88 S.Ct. 1868, 1877–78, 20 L.Ed.2d 889 (1968)

*ed States*, 441 U.S. 238, 258, 99 S.Ct. 1682, 1694, 60 L.Ed.2d 177 (1979); *Irvine v. California*, 347 U.S. 128, 133, 74 S.Ct. 381, 383, 98 L.Ed. 561 (1954) (discussing *Rochin*); *United States v. Valenzuela*, 596 F.2d 824, 829–30 (9th Cir.), *cert. denied*, 441 U.S. 965, 99 S.Ct. 2415, 60 L.Ed.2d 1071 (1978). Claims that otherwise reasonable searches have been conducted in an unconstitutionally unreasonable manner must be judged under the facts and circumstances of each case. *See Harris v. United States*, 331 U.S. 145, 150, 152–53, 67 S.Ct. 1098, 1101, 1102, 91 L.Ed.2d 1399 (1947), *overruled on other grounds, Chimel v. California*, 395 U.S. 752, 89 S.Ct. 2034, 23 L.Ed.2d 685 (1969).

■ Under this case's facts and circumstances, we find that the police conduct was not "unreasonable" under the Fourth Amendment. We have held that, where there is a clear indication of narcotics trafficking, border officials may command a rectal search despite the suspect's physical resistance. *Rivas v. United States*, 368 F.2d 703; *Blackford v. United States*, 247 F.2d 745. Here there was abundant probable cause to suspect Clara Penn of narcotics trafficking, and before the bribe was offered Reggie had revealed that he knew where the heroin was hidden. The increment of unreasonableness between a bribe of a young son and a rectal search despite physical resistance, if indeed the former is more unreasonable than the latter, is not of constitutional significance.

Moreover, the same factors which, we held *supra*, made the police conduct not fundamentally unfair also indicate that it was not unreasonable.

After *Rakas v. Illinois*, 439 U.S. 128, 139–40, 99 S.Ct. 421, 429, 58 L.Ed.2d 387 (1978), the inability of one person to assert the violation of another's Fourth Amendment rights is expressed not in terms of standing,

but in the substantive terms of "whether the disputed search and seizure has infringed an interest of the defendant which the Fourth Amendment was designed to protect." The police's interaction with ("search" of, perhaps) Reggie, even if it was unreasonable, did not violate any legitimate expectation of privacy or other Fourth Amendment interest of Clara Penn. Therefore, the Fourth Amendment does not exclude the evidence from her trial.

If we could say that the police searched Reggie or seized information from him, within the meaning of the Fourth Amendment, at all, it could only be on the theory that Clara Penn had put information "in" Reggie, just as she might have written it down and put it in a drawer. But although she might have had a legitimate expectation of privacy in a drawer, she had none in Reggie, because he was free to reveal the information at will to anyone in the world. Even if somehow this was a "search" of Reggie that violated *his* Fourth Amendment rights, there was no violation of Clara Penn's Fourth Amendment rights.[8] The fruit of that "search" is admissible at her trial.

## C. *Substantive Due Process*

■ Penn alleges that the evidence should be suppressed, even if it otherwise could not be under the Fifth or Fourth Amendment, because the bribe of Reggie violated substantive due process in that it intruded on a "zone of privacy" comprising family life. *See Griswold v. Connecticut*, 381 U.S. 479, 85 S.Ct. 1678, 14 L.Ed.2d 510 (1965).

However, Penn is not entitled, under past cases, to a constitutional remedy for this intrusion into the family circle. This case does not involve the special intimacy characteristic of the areas of sexual relations

---

(generally as to searches reasonable at their inception). The portion of a search that exceeds the scope of a warrant is, of course, unwarranted. The allegation here is rather that the search was too "intense."

**8.** Clara Penn had no special Fourth Amendment interest in the confidence of her intrafamily communications that might have been violated by a "search" of Reggie. *See* the discussion in subpart C *infra* (no substantive due process exclusionary rule for intra-family communications).

and reproduction, *see id.; Roe v. Wade,* 410 U.S. 113, 93 S.Ct. 705, 35 L.Ed.2d 147 (1973), nor does it involve any fundamental parental right, *see Pierce v. Society of Sisters,* 268 U.S. 510, 45 S.Ct. 571, 69 L.Ed. 1070 (1925) (choice of child's education); *Wisconsin v. Yoder,* 406 U.S. 205, 92 S.Ct. 1526, 32 L.Ed.2d 15 (1972) (choice of child's religious practices). Therefore, no "family" interest of constitutional stature is implicated here.

Moreover, past substantive due process cases based on "family" interests all have involved systematic regulation of the interest, *Doe v. Irwin,* 615 F.2d 1162, 1168 (6th Cir. 1980). *See, e. g., Griswold v. Connecticut,* 381 U.S. 479, 85 S.Ct. 1678, 14 L.Ed.2d 510 (birth control—statute); *Moore v. City of East Cleveland,* 431 U.S. 494, 97 S.Ct. 1932, 52 L.Ed.2d 531 (extended family—zoning ordinance); *Cleveland Board of Education v. LaFleur,* 414 U.S. 632, 94 S.Ct. 791, 39 L.Ed.2d 52 (1974) (maternity leave—school regulations). Here we have only a single, isolated intrusion, with no apparent threat of repetition. We choose to keep our constitutional powder dry against the day when we are shown that repetitions have occurred or even that this kind of conduct has become regular police policy.

### D. *Sixth Amendment*

■ Even if the police violated Reggie's *Miranda* rights, Clara Penn has no standing to assert the violation. *United States v. Pruitt,* 464 F.2d 494, 495 (9th Cir. 1972). The Sixth Amendment does not prohibit the introduction against her at trial of Reggie's statements or any evidence derived from them.

### III. *Non-Constitutional Grounds*

#### A. *Supervisory Power*

■ Although if we were to affirm the suppression order it would be more appropriate for us to do so under our supervisory power than under the Constitution, we decline to exercise our supervisory power in this case. The role of the supervisory power is not "to give the federal judiciary a 'chancellor's foot' veto over law enforcement practices of which it [does] not ap-

prove." *United States v. Russell,* 411 U.S. at 435, 93 S.Ct. at 1644 (quasi-entrapment); *see also Hampton v. United States,* 425 U.S. 484, 493, 96 S.Ct. 1646, 1651, 48 L.Ed.2d 113 (1976) (Powell, J., concurring in the judgment); *id.* at 490, 96 S.Ct. at 1650 (plurality opinion). We have recently stated that although "we could neither endorse nor condone" using an improper source of funds to pay an informant to testify, "resort to the exercise of the Court's supervisory power [to strike the testimony] would be an improper use of the power merely to foreclose law enforcement practices which we do not approve." *United States v. Shelton,* 588 F.2d 1242, 1246 (9th Cir. 1978), *cert. denied,* 442 U.S. 909, 99 S.Ct. 2822, 61 L.Ed.2d 275 (1979).

The Sixth Circuit has gone further, holding that

> the traditional area for exercising [supervisory] powers has been within the framework of judicial proceedings. . . . It is quite another matter, however, to extend the court's supervisory power to areas outside this traditional domain of the court. To do so here, where the government conduct does not offend a personal right of any defendant, would be directly "to give the federal judiciary a 'chancellor's foot' veto over law enforcement practices of which it did not approve." . . . This is particularly so where, as here, no precise violation of any penal statute by the officers in question is shown.

*United States v. Leja,* 563 F.2d 244, 247 (6th Cir. 1977) (quasi-entrapment), *cert. denied,* 434 U.S. 1074, 98 S.Ct. 1263, 55 L.Ed.2d 780 (1978).

■ The same palliative factors that we considered *supra* persuade us that, although we disapprove of the policeman's conduct, this is not an appropriate case in which to exercise our extraordinary supervisory power and exclude the challenged evidence.

#### B. *Privilege*

■ Federal Rule of Evidence 501 declares that the existence and extent of priv-

ileges "shall be governed by the principles of the common law as they may be interpreted by the courts of the United States in the light of reason and experience."

There is no judicially or legislatively recognized general "family" privilege, *cf. Trammel v. United States*, 445 U.S. 40, 100 S.Ct. 906, 63 L.Ed.2d 186 (1980) (spouse may testify against her mate over his objection); *United States v. Lefkowitz*, 618 F.2d 1313 (9th Cir. 1980) (spouse may provide information to police for use in search directed against her mate), and we decline to create one here.

## IV. Conclusion

No legal basis, constitutional or other, supported the district court's suppression order. Therefore, we reverse the order.

REVERSED and REMANDED.

GOODWIN, Circuit Judge, dissenting:

I agree with the majority that the police conduct in the execution of the search warrant in this case did not violate the due process clause of the Fifth Amendment. I dissent, however, from the reversal of the district court's order suppressing the evidence because I believe that the search was unreasonable under the Fourth Amendment.

The majority finds that the trial judge was wrong in stretching the *Rochin* line of cases to cover the facts in this case, and essentially rests. Although the majority purports to examine the search under the Fourth Amendment standard of reasonableness, it fails to differentiate adequately between the shockingness and reasonableness standards.

A search can be unreasonable under the Fourth Amendment without offending the Fifth Amendment. *See Blackford v. United States*, 247 F.2d 745, 750 (9th Cir. 1957). (*Blackford* and a subsequent case, *Rivas v. United States*, 368 F.2d 703 (9th Cir. 1966), involved body cavity searches, and both held the searches to be reasonable.)

Here we have no body cavity search for drugs at a border station, but the execution of a warrant to search a backyard for drugs. Instead of digging with a shovel, which might have been hot and dirty work, the officers merely promised a five-year-old child a five dollar bill if he would show them the location of the heroin cache.

The Fourth Amendment requires that any search conducted by the government satisfy the condition of reasonableness, in both the initial justification for the search and the manner in which the search is executed. *Ker v. California*, 374 U.S. 23, 83 S.Ct. 1623, 10 L.Ed.2d 726 (1963); *United States v. Valenzuela*, 596 F.2d 824, 829–830 (9th Cir.), *cert. denied*, 441 U.S. 965, 99 S.Ct. 2415, 60 L.Ed.2d 1071 (1979); *Duncan v. Barnes*, 592 F.2d 1336, 1338 (5th Cir. 1979). This reasonableness requirement, with roots deep in American history, protects the individual's "right to be let alone" against arbitrary, unjustifiable or unreasonable government intrusions. *Olmstead v. United States*, 277 U.S. 438, 478–79, 48 S.Ct. 564, 572, 72 L.Ed. 944 (1928) (Brandeis, J., dissenting). *See also Boyd v. United States*, 116 U.S. 616, 624–32, 6 S.Ct. 524, 528–33, 29 L.Ed. 746 (1886). *See generally* N. Lasson, *The History and Development of the Fourth Amendment to the United States Constitution* (1937).

Of course, the right embodied in the Fourth Amendment is not an absolute right. It must "give fair leeway for enforcing the law in the community's protection." *Brinegar v. United States*, 338 U.S. 160, 176, 69 S.Ct. 1302, 1311, 93 L.Ed. 1879 (1949). Indeed, privacy must give way in many situations. No person would be secure in his or her person or property if the police were totally immobilized by judicial rules which weakened their capacity to combat crime. Therefore, as is the case with many constitutional rights, the concept of reasonableness within the Fourth Amendment should afford "the best compromise * * * for accommodating * * often opposing interests." *Id.*

The standard of reasonableness embodied in the Fourth Amendment demands a balance between the government's justification for the search and the degree of intru-

sion resulting from the search. *Berger v. New York*, 388 U.S. 41, 69, 87 S.Ct. 1873, 1888, 18 L.Ed.2d 1040 (1967) (Stewart, J., concurring); *Camara v. Municipal Court*, 387 U.S. 523, 87 S.Ct. 1727, 18 L.Ed.2d 930 (1967); *Terry v. Ohio*, 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968). More specifically, in the investigation of criminal activity the standard may be viewed as requiring:

> "* * * an approach which determines the reasonableness of each investigative technique by balancing the seriousness of the suspected crime and the degree of reasonable suspicion possessed by the police [that the search will in fact lead to evidence that will solve the crime] against the magnitude of the invasion of personal security and property rights of the individual involved * * *."

Barrett, *Personal Rights, Property Rights and the Fourth Amendment*, 1960 Sup.Ct. Rev. 46, 63.

No one here attacks the validity of the search warrant. Rather, the focus of Fourth Amendment inquiry in this case is on the manner in which the admittedly justified search of the Penn house and yard was conducted by the police. Although a search warrant need not set forth precisely the procedures to be followed by the executing officers, *Dalia v. United States*, 441 U.S. 238, 99 S.Ct. 1682, 60 L.Ed.2d 177 (1979), the Supreme Court has only recently reiterated that "the manner in which a [search] warrant is executed is subject to later judicial review as to its reasonableness." *Id.* at 258, 99 S.Ct. at 1694. *See also United States v. Valenzuela*, 596 F.2d at 829–830.

To restate the issue, the question is whether offering young Reginald money to induce him to point out where, exactly, in the large area covered by the warrant, evidence of his mother's criminal activity lay hidden was a reasonable manner in which to execute the warranted search. Several factors must be balanced.

Heroin trafficking is serious crime. On the other hand, society also has an interest in the propriety of police tactics regardless of the gravity of the offenses to be prevented. The government is not free to employ any means at hand to restrict heroin distribution. One goal of the Fourth Amendment is to protect the public from unnecessarily intrusive police searches. If the police behave in a manner which brings the law into disrepute, the resulting institutional damage to the government may be as socially undesirable as the crime the police combat.

Questioning individuals about crimes they may have observed is a valuable and respected method by which police obtain information. This is true even when questions are put to children. Everyone is expected to help solve crimes. And although social esteem for informers decreases when they are paid, particularly when they are paid to inform on their own families, paying for information is generally an acceptable police practice.

However, use of very young children as paid informers is offensive because they may be incapable of giving reasoned and voluntary consent. Recruiting a five-year-old child to act as a paid informer against a parent is perceived as singularly reprehensible. Only the most exigent of circumstances might justify that investigatory tactic under the Fourth Amendment standard of reasonableness. A lay person might, for example, applaud a police officer who paid a small child for information to save the life of a kidnap victim buried alive in an underground box. But that same person might well object on moral grounds to paying a small child for information to put a parent in jail for failing to pay parking tickets. The case at bar is not easy; it would not be here *en banc* if it fell clearly at either end of a continuum.

Here, the offer of money to Reginald was only a shortcut to obtaining evidence the police could have found by a bit of digging. There was testimony that the police intended to "dig up the entire backyard" if their initial efforts at finding the heroin proved fruitless. Indeed, under questioning by defense counsel, the police refused to concede they would not have found the cache of

heroin without Reginald's help. The house and yard were secured. The action taken by the police was not necessary to prevent destruction or consumption of the heroin. Simply put, the consequences of not finding the heroin quickly were not so grave as to justify the particular shortcut the officers took.

Thus, the two related inquiries which this circuit identified in *Blackford, supra* at 752–753, and *Rivas, supra* at 711–712, as crucial to judicial determination of a search's reasonableness here support a finding of unreasonableness. The police's shortcut was unnecessary, except as a time-saver in a situation in which time was not of the essence, and less intrusive methods of carrying out the search were reasonably available.

Moreover, police uncertainty about whether Reginald actually knew where the heroin was located makes their need to use him as a paid informer even less urgent than if he were the last resort. The probability that the police tactic used here would solve the crime under investigation was less than overwhelming.

By offering money to the defendant's five-year-old son, the police intruded in this case on a family relationship that is highly valued.[1] Confidence between parents and their children enhances preservation of the family unit, an interest which the law should promote when it has the opportunity. At least, the law should not unnecessarily make parents and children apprehensive about exchanging information. Nor should the law encourage children to turn against their parents.

Yet like other values, family preservation is not absolute. Recognition of parent-child privacy rights as paramount in all cases might encourage criminally inclined individuals to employ the family as a shield for their criminal work. Where the family is so abused, social gain from judicial advance-

ment of family privacy would be at the expense of injury to the social fabric elsewhere. An intuitive and not unjustifiable notion exists that persons in the business of selling heroin do not deserve to have their privacy protected in circumstances such as these. This rationale may in part explain the majority's reluctance to enter into a Fourth Amendment balancing exercise.

Yet our law presumes innocence until the contrary is proven by proper process, including legally admissible evidence. The reasonableness of a search is determined by reference to the circumstances known at the time of the search. It is axiomatic that a search that is unreasonable when made does not become reasonable after the fact by virtue of the evidence that is uncovered. *Cf. Henry v. United States,* 361 U.S. 98, 103, 80 S.Ct. 168, 171, 4 L.Ed.2d 134 (1959) (arrest not justified by what subsequent search discloses).

Finally, we must consider whether the police tactics used here carried with them a probability of harm to the child. Children of tender years do not appreciate all the consequences of their actions. They are very impressionable. Recently, for example, the Federal Trade Commission has acted in response to petitions and a staff report citing massive evidence that children under eight years of age are the helpless victims of aggressive television advertising that will ruin their teeth if not their overall health. *See* Children's Advertising, Proposed Trade Regulation Rulemaking and Public Hearing, 43 Fed.Reg. 17967 (1978). Without speculating about the merits of child psychology as applied elsewhere, it seems modest enough here to suggest that paying, or promising to pay, a child to inform upon his or her parents verges upon undue influence.

In addition, Reginald's experience could leave him with permanent scars. This type

---

1. Professor LaFave cautions that police execution of a warrant in a manner which unnecessarily damages physical property, "for example, by tearing up linoleum or carpeting," should be found unreasonable. 2 W. LaFave, *Search and Seizure: A Treatise on the Fourth* *Amendment* at 161 and n. 54 (1978). The relationship between a mother and young child is at least as worthy of protection under the Fourth Amendment against unnecessary and damaging governmental intrusion.

of exploitation of young children might well cause irreparable psychological damage when the children one day realize, as is inevitable, that they were instrumental in sending their parents to jail. This price may be too high even if the tactic helps in suppressing crime.

Therefore, in balancing the various interests in this case, I find myself sharing the instinctive reaction of the district judge. The conduct of the police was unreasonable. No serious consequences were averted by the shortcut taken in the search and a reasonable alternative method was available to police. The warrant authorized them to dig up the yard. They should have done so. They would not then have made the child the enemy of his mother. In the circumstances of this case the search was conducted in an unreasonable, and thus unconstitutional manner. The order suppressing the evidence should be affirmed.[2]

KENNEDY, HUG and TANG, Circuit Judges, concur in this dissent.

KENNEDY, Circuit Judge, dissenting, with whom HUG and TANG, Circuit Judges, concur:

I agree completely with Judge Goodwin's dissenting opinion. These brief additional comments seem appropriate in view of all the implications of the case.

The rigidities of the exclusionary rule, and the occasional frustration caused by its enforcement, should not obscure the fact that determinations of fourth amendment reasonableness must be made independently of the question whether exclusion of the evidence is undesirable for other reasons. It distorts the idea of reasonableness to hold, as the court does today, that the police conduct does not require exclusion of the evidence, even on the plausible assumption that in this instance the police acted in good faith.

The requirement that the defendant must show injury to his or her own rights in order to object to evidence is altogether met here. The question is whether the police can use the search of a residence as the occasion for a severe intrusion upon the relation between a mother and a child who has not reached the age of reason. Her relationship to the child belongs intimately to the mother. *See Morrison v. Jones*, 607 F.2d 1269, 1275–76 (9th Cir. 1979) (per curiam), *cert. denied*, 445 U.S. 962, 100 S.Ct. 1648, 64 S.Ct. 237 (1980). To say that she has no standing to complain of the stark intrusion upon it in this case is to assume a negative to the very question in issue, namely, to what extent the law can protect the relationship from disruption in the home.

The existence of the parent-child union and the fundamental place it has in our culture require no citation, but it is perhaps appropriate to note that courts have protected it where the threat of disruption is in some respects more attenuated than in the circumstances of the case before us. *See Moore v. City of East Cleveland*, 431 U.S. 494, 97 S.Ct. 1932, 52 L.Ed.2d 531 (1977); *Wisconsin v. Yoder*, 406 U.S. 205, 92 S.Ct. 1526, 32 L.Ed.2d 15 (1972); *Pierce v. Society of Sisters*, 268 U.S. 510, 45 S.Ct. 571, 69 L.Ed. 1070 (1925). As to the degree of intrusion upon the relationship, my contention that the police erred in using this infant child as the volitionless instrument for sending his mother to prison after entering their home is not answered by the apologetics of the majority. The suggestion that a determination of Clara Penn's constitutional rights in her relation with Reginald should be influenced by our consideration of her alleged criminal exploitation of him or his siblings is inapt: there is inadequate support for the assertion. The record discloses only statements attributed to anonymous informants by an officer that some

2. The district court's finding of shockingness under the Fifth Amendment necessarily incorporates a finding of unreasonableness under the Fourth Amendment. *See Blackford v. United States*, 247 F.2d 745, 750 (9th Cir. 1957). The majority treats the reasonableness determination as a question of law, although recognizing that it must be based on the facts and circumstances of each case. I would give greater deference to the trial court's finding under the "clearly erroneous" standard of review.

unspecified children were involved. Reginald's particular involvement in crime is nowhere suggested and would be supported only by rank hearsay in any event. Knowledge of an object's location does not logically imply involvement in its placement.

If we can, and do, protect the relation between a dentist and his clients from a disruptive search, see VonderAhe v. Howland, 508 F.2d 364, 370 (9th Cir. 1974), certainly we have the authority, and the duty, to protect the relation between a mother and child from such manipulation. There are cases in which the source of evidence has a special constitutional status, see, e. g., Stanford v. Texas, 379 U.S. 476, 85 S.Ct. 506, 13 L.Ed.2d 431 (1965). In such instances we impose a stricter definition for reasonableness of the search and for particularity of the warrant, both to protect the source from unnecessary intrusion and to prevent a general search. See also United States v. Sherwin, 572 F.2d 196 (9th Cir. 1977), cert. denied, 437 U.S. 909, 98 S.Ct. 3101, 57 L.Ed.2d 1140 (1978); United States v. Drebin, 557 F.2d 1316 (9th Cir. 1977), cert. denied, 436 U.S. 904, 98 S.Ct. 2232, 56 L.Ed.2d 401 (1978). If circumstances disclose some compelling urgency for the police to invade areas entitled to special protection of the law, we have held that specific justification for the severe intrusion must be made to the magistrate upon application for a warrant. United States v. Cameron, 538 F.2d 254 (9th Cir. 1976). These authorities establish protection for the parental relation in this case, and dictate further a finding that there was no justification for conducting the search in this manner and with such disruptive force on the mother and her child.

I know for a certainty that none of my brothers sitting in this case would neglect for an instant their duty to protect essential liberties; I regret only that we the dissenters have been unable to convince them that the case before us presents a question of this gravity. The assault on the parent and child bond is relentless and deliberate in many countries of the world, see Amnesty International, Children (1979), and to some observers the manipulation of the child and the injury to the relationship that occurred in this case may seem innocuous by comparison. I view the police practice here as both pernicious in itself and dangerous as precedent. Indifference to personal liberty is but the precursor of the state's hostility to it. That is why the judgment is entered over my emphatic dissent.

Before WRIGHT, CHOY, GOODWIN, WALLACE, SNEED, KENNEDY, ANDERSON, HUG, and TANG, Circuit Judges.

## ORDER

A member of this court has requested rehearing of this case by the full court. A majority of the active judges of the court have voted to deny such a rehearing.

Accordingly, the request for rehearing by the full court is denied.

The mandate shall issue forthwith.

FLETCHER, Circuit Judge, dissenting from the denial of a rehearing en banc:

This case was decided at a unique time of transition for this court. Several judges who originally voted to hear the case en banc left the court before they could participate in the decision, and our rules did not permit the newly appointed judges to participate. Because the decision may have a profound effect on the law of this circuit and on the conduct of law enforcement officers, the case should be reheard en banc by the court as now constituted.

The majority opinion is deeply troubling for reasons well expressed by my brothers GOODWIN, KENNEDY, and FERGUSON. It ignores the body of case law emphasizing the significance of the family and expanding the zone of constitutional protection we accord the private sanctuary of family life.[1]

1. See Moore v. City of East Cleveland, 431 U.S. 494, 97 S.Ct. 1932, 52 L.Ed.2d 531 (1977), in which Justice Powell, speaking for a plurality of the Court, said: "Our decisions establish that the constitution protects the sanctity of the family precisely because the institution of the family is deeply rooted in this Nation's history and tradition." 431 U.S. at 503. See

A parent's relationship with her young child certainly falls within this protected area. The majority is on dangerous and frightening ground when it ties the level of constitutional protection to the court's perception of the quality of the Penn family.[2] This invites police to apply an "Ozzie and Harriet" test by which the reasonableness of a search is based in part on the worthiness of the family.

On another level, the majority overlooks our duty to give harried police officers clear guidance about permissible investigatory techniques. The majority creates uncertainty by making the reasonableness of the search depend on such vague factors as the severity of the offense, the character of the suspect, and the quality of Penn's family and mothering.

Finally, the majority misconceives the function of the exclusionary rule. We are concerned not with the guilt or innocence of the particular defendant, but with providing guidelines for future police conduct towards other, perhaps innocent, citizens.[3] To prevent police from employing young children as spies against their parents we must hold that such tactics will yield no admissible evidence.

PREGERSON, Circuit Judge (dissenting from the denial of a rehearing en banc):

I concur in Judge Fletcher's and Judge Ferguson's dissents from the denial of a rehearing en banc.

FERGUSON, Circuit Judge, dissenting from the denial of a rehearing en banc by the full court:

In order to avoid an overflow of emotion triggered by the majority opinion, I have chosen to set forth only briefly my reasons why this case must be reheard en banc.

First, the majority repeatedly assert that it would affirm the district court but for the fact that the police conduct was a single isolated intrusion. That fact is refuted by the record. As set out on page 21 of the reporter's transcript of the hearing on the suppression motion, Officer Stanford testified, *"It was actually the first time that I ever did this with a child that young."* The implication of this statement is obvious: bribing children to inform against their parents is *not* an isolated police practice.

Secondly, the case began as a state prosecution. After the state trial judge suppressed the evidence because of the activities of the police in his state, the state prosecutor dismissed the charges.

If this police conduct is offensive to the state courts of Washington, it is offensive to the basic principles of federalism when the federal courts tell the people of Washington that they must accept that type of police conduct. The erosion of the basic concepts of federalism was denounced by the Chief Justice in his address of June 10, 1980 to the American Law Institute.

Thirdly, the adoption by this circuit of the principle that before it will invalidate police misconduct there must be a regular practice of such misconduct is unsupported in both law and reason. This new rule will cause mischief beyond belief to the constitutional liberties of all Americans.

Lastly, the emotions created by this case have caused the court to brush aside its appellate responsibilities. Rule 12(e) of the Criminal Rules requires district courts in determining suppression motions to make findings on the record, and we must enforce this rule if we are to properly adjudicate cases on appeal.

*also Smith v. Organization of Foster Families for Equality & Reform,* 431 U.S. 816, 842–47, 97 S.Ct. 2094, 2108–11, 53 L.Ed.2d 14 (1977); *Wisconsin v. Yoder,* 406 U.S. 205, 213, 92 S.Ct. 1526, 1532, 32 L.Ed.2d 15 (1972); *Stanley v. Illinois,* 405 U.S. 645, 651, 92 S.Ct. 1208, 1212, 31 L.Ed.2d 551 (1972); *Griswold v. Connecticut,* 381 U.S. 479, 482–86, 85 S.Ct. 1678, 1680–82, 14 L.Ed.2d 510 (1965); *Prince v. Massachusetts,* 321 U.S. 158, 166, 64 S.Ct. 438, 442, 88 L.Ed. 645 (1944); *Pierce v. Society of Sisters,* 268 U.S. 510, 534–35, 45 S.Ct. 571, 573, 69 L.Ed. 1070 (1925); *Meyer v. Nebraska,* 262 U.S. 390, 399–402, 43 S.Ct. 625, 626–28, 67 L.Ed. 1042 (1923).

**2.** *See ante* at 881 & n. 6.

**3.** *See Stone v. Powell,* 428 U.S. 465, 486, 96 S.Ct. 3037, 3048, 49 L.Ed.2d 1067 (1976).

The district judge did not make any findings other than the conclusory one that the conduct of the officer shocked his conscience. In fact, the search warrant and the affidavit in support of it, which were pivotal in deciding the suppression motion, were not even received in evidence and are not a part of the record on appeal.

It is submitted that the court should not decide cases on such record. As the decision in this case demonstrates, only confusion will result.